BLUE HARVEST, INC v DEPARTMENT OF TRANSPORTATION

Docket No. 281595. Submitted July 7, 2009, at Lansing. Decided April 29, 2010, at 9:00 a.m.

Blue Harvest, Inc., Blueberry Heritage Farms, Inc., and others engaged in the commercial production of blueberries in Ottawa and Muskegon counties brought an action in the Court of Claims against the Department of Transportation (DOT), alleging trespass-nuisance and inverse condemnation as a result of the physical intrusion of road salt from adjacent highways and roads onto plaintiffs' properties. Plaintiffs also brought a claim in the Ottawa Circuit Court against the Ottawa County Road Commission, alleging inverse condemnation as a result of road salt intrusion. The cases were consolidated in the Ottawa Circuit Court. The trial court, Edward R. Post, J., granted summary disposition to DOT and Ottawa County on the inverse-condemnation claims and denied DOT's motion for summary disposition on the trespass-nuisance claim and instead, determining that a trespass-nuisance exception to governmental immunity existed, granted summary disposition in favor of plaintiffs on that claim. DOT appealed as of right the denial of its motion for summary disposition of the trespass-nuisance claim. Plaintiffs cross-appealed the order granting summary disposition to both defendants on the inverse-condemnation claims.

The Court of Appeals *held*:

1. There is no trespass-nuisance exception to the doctrine of sovereign immunity for claims against the state. The Legislature did not provide a trespass-nuisance exception to governmental immunity for claims against the state, and there was no common-law trespass-nuisance exception to sovereign immunity before July 1, 1965. DOT was entitled to summary disposition with regard to the trespass-nuisance claim. The order granting summary disposition of that claim in favor of plaintiffs must be reversed, and the case must be remanded for the entry of a judgment in favor of DOT with regard to that claim.

2. The right to just compensation, in the context of an inverse-condemnation suit for diminution in value caused by the alleged harmful effects to property abutting a public highway, exists only

where the landowner can allege a unique or special injury, that is, an injury that is different in kind, not simply in degree, from the harm suffered by all persons similarly situated. The just-compensation requirement of the Michigan Constitution does not require the state to compensate every property owner in proximity to a public highway for the normal inconveniences associated therewith. A plaintiff states a claim for which relief may be granted only if the plaintiff alleges harm of a unique or peculiar kind. Plaintiffs have suffered some kind of loss as a result of the application of the road salt; however, their claims are precluded under the common-law doctrine of *damnum absque injuria*. Plaintiffs' injury is merely of a different degree than that suffered by the public at large. The trial court properly held that the injury was not actionable. The order granting summary disposition of the inverse-condemnation claims in favor of defendants must be affirmed.

Affirmed in part, reversed in part, and remanded.

BECKERING, J., concurring, wrote separately to elaborate on the majority's analysis that revealed that a common-law exception did not exist before July 1, 1965, with respect to trespass-nuisance claims against the state. Plaintiffs cited no caselaw establishing that any exceptions to governmental immunity with respect to political subdivisions before 1965 are to be imputed to sovereign immunity as well. Although trespass-nuisance claims and unconstitutional-taking claims are similar, they remain distinct actions. The difference between the injuries suffered by plaintiffs and similarly situated property owners is best categorized as one of degree, and not of kind, and therefore the majority properly determined that plaintiffs' inverse-condemnation claims must fail.

1. GOVERNMENTAL IMMUNITY — SOVEREIGN IMMUNITY — EXCEPTIONS — TRESPASS-NUISANCE.

There is no trespass-nuisance exception to the doctrine of sovereign immunity for claims against the state (MCL 691.1407[1]).

2. HIGHWAYS — INVERSE-CONDEMNATION ACTIONS — JUST COMPENSATION — UNIQUE OR SPECIAL INJURIES.

The right to just compensation, in the context of an inverse-condemnation suit for diminution in value caused by the alleged harmful effects to property abutting a public highway, exists only where the landowner can allege a unique or special injury that is different in kind, not simply in degree, from the harm suffered by all persons similarly situated.

*Varnum, Riddering, Schmidt & Howlett LLP* (by *Stephen P. Afendoulis* and *Beverly Holaday*) for plaintiffs.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, and *Patrick F. Isom*, Assistant Attorney General, for the Department of Transportation.

*Smith Haughey Rice & Roegge* (by *Jon D. Vander Ploeg* and *Charles F. Behler*) for the Ottawa County Road Commission.

Before: METER, P.J., and MURRAY and BECKERING, JJ.

METER, P.J. Defendant Department of Transportation (DOT) appeals as of right from an order denying its motion for summary disposition on grounds of governmental immunity regarding plaintiffs' trespass-nuisance claim. Plaintiffs cross-appeal to challenge the grant of summary disposition to both defendants on plaintiffs' inverse-condemnation claim. We reverse the trial court's order relating to the trespass-nuisance claim but affirm in all other respects. Of particular note is our holding that there is no trespass-nuisance exception to the doctrine of sovereign immunity.

Plaintiffs are engaged in the commercial production of blueberries in Ottawa and Muskegon counties. Plaintiffs own or lease property that is adjacent to highways or primary county roads. DOT contracts with county road commissions, including defendant Ottawa County Road Commission (Ottawa County), to maintain the highways and county roads during the winter, when salt is used to prevent the formation of ice on the highways and roads. Plaintiffs claim that the amount of salt used in western Michigan has increased during a pertinent 15-year period. They allege that droplets of salt-laden

water are thrown into the air by passing vehicles and are then blown by the wind onto plaintiffs' property. They contend that this salt spray causes damage to plaintiffs' blueberry bushes, which results in a loss of blueberry production from those bushes.

Plaintiffs sued DOT and Ottawa County, alleging inverse condemnation. Plaintiffs also raised a claim of trespass-nuisance against DOT. The trial court granted summary disposition under MCR 2.116(C)(10) to DOT and Ottawa County on the inverse-condemnation claim, finding that plaintiffs failed to present evidence to establish that their injury was "of a unique or peculiar character different from the effects experienced by all similarly situated property owners." The trial court concluded that plaintiffs were not permanently deprived of their property and that "the incidental entry of road salt onto Plaintiffs' properties has only rendered the growing of blueberries uneconomical." The trial court further found that there was no "direct and immediate intrusion" onto plaintiffs' property in this case.[1]

The trial court subsequently denied DOT's motion for summary disposition under MCR 2.116(C)(7) (governmental immunity) on the trespass-nuisance claim and instead determined that plaintiffs were entitled to summary disposition on this claim under MCR 2.116(C)(10). The trial court followed *Hadfield v Oakland Co Drain Comm'r*, 430 Mich 139, 147-149; 422 NW2d 205 (1988), overruled by *Pohutski v City of Allen Park*, 465 Mich 675; 641 NW2d 219 (2002). *Hadfield* held that a limited trespass-nuisance exception to governmental immunity existed, consistent with caselaw

---

[1] The trial court first granted summary disposition to Ottawa County in a separate proceeding and then later applied the same rationale in granting summary disposition to DOT.

predating the enactment of statutory immunity. See *Hadfield*, 430 Mich at 147-150 (opinion by BRICKLEY, J.). The trial court concluded that plaintiffs established the elements for their trespass-nuisance claim and that plaintiffs were therefore entitled to summary disposition.

On appeal, DOT argues that the trial court erred by denying its motion for summary disposition on the trespass-nuisance claim because it is entitled to immunity with regard to this claim.

This Court reviews de novo a trial court's grant of summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). In determining whether summary disposition under MCR 2.116(C)(7) is appropriate, a court considers all documentary evidence submitted by the parties, accepting as true the contents of the complaint unless affidavits or other appropriate documents specifically contradict them. See *Patterson v Kleiman*, 447 Mich 429, 433-435; 526 NW2d 879 (1994). "If the facts are not in dispute and reasonable minds could not differ concerning the legal effect of those facts, whether a claim is barred by immunity is a question for the court to decide as a matter of law." *Poppen v Tovey*, 256 Mich App 351, 354; 664 NW2d 269 (2003); see also *Cain v Lansing Housing Comm*, 235 Mich App 566, 568; 599 NW2d 516 (1999) ("[A]pplicability of governmental immunity is a question of law that is reviewed de novo on appeal.").

Disposition of the present issue requires this Court to resolve the question whether the tort of trespass-nuisance is an exception to governmental immunity. Trespass-nuisance is a trespass or interference with the use or enjoyment of land by way of a physical intrusion that the government sets in motion and that results in personal or property damage. *McDowell v Detroit*, 264

Mich App 337, 352; 690 NW2d 513 (2004), rev'd on
other grounds 477 Mich 1079 (2007). Its elements have
been stated simply as a condition, a cause, and control
by the government. *Id.*

MCL 691.1407(1) provides:

> Except as otherwise provided in this act, a governmental
> agency is immune from tort liability if the governmental
> agency is engaged in the exercise or discharge of a govern-
> mental function. Except as otherwise provided in this act,
> this act does not modify or restrict the immunity of the
> state from tort liability as it existed before July 1, 1965,
> which immunity is affirmed.

"Absent a statutory exception, a governmental
agency is immune from tort liability when it exercises
or discharges a governmental function." *Maskery v
Univ of Mich Bd of Regents*, 468 Mich 609, 613; 664
NW2d 165 (2003). A "governmental agency" is "the
state or a political subdivision." MCL 691.1401(d).
" 'State' means the state of Michigan and its agencies,
departments, commissions, courts, boards, councils,
and statutorily created task forces and includes every
public university and college of the state, whether
established as a constitutional corporation or other-
wise." MCL 691.1401(c). "Political subdivision"

> means a municipal corporation, county, county road com-
> mission, school district, community college district, port
> district, metropolitan district, or transportation authority
> or a combination of 2 or more of these when acting jointly;
> a district or authority authorized by law or formed by 1 or
> more political subdivisions; or an agency, department,
> court, board, or council of a political subdivision. [MCL
> 691.1401(b).]

The statutory exceptions to governmental immunity
are failure to maintain highways, MCL 691.1402(1); the
negligent operation of government-owned vehicles,

MCL 691.1405; public-building defects, MCL 691.1406; the performance of proprietary functions, MCL 691.1413; and the ownership or operation of certain governmental hospitals, MCL 691.1407(4). MCL 691.1417 *et seq.* also provides for liability for sewage-disposal-system events. None of these exceptions is relevant to the present case.

Previously, the Supreme Court held that a limited, nonstatutory trespass-nuisance exception existed to governmental immunity. *Hadfield*, 430 Mich at 145 (opinion by BRICKLEY, J.). Later, in *Pohutski*, 465 Mich at 685, the Supreme Court noted that it had "strayed from the plain language" of MCL 691.1407(1) when it concluded in *Hadfield* that "the historic trespass-nuisance exception was required by the language of [MCL 691.1407(1)]." The Supreme Court in *Pohuski* overruled *Hadfield* to "rectify *Hadfield*'s misconstruction of the statutory text." *Pohutski*, 465 Mich at 695.

Significantly, however, the *Pohutski* Court, in reaching its conclusions, relied on the word "state" from the second sentence of MCL 691.1407(1). *Id.* at 688-689. Again, this sentence states: "Except as otherwise provided in this act, this act does not modify or restrict the immunity *of the state* from tort liability as it existed before July 1, 1965, which immunity is affirmed." (Emphasis added.) The *Pohutski* Court concluded that because cities, and not the state as defined in MCL 691.1401(c), were involved in that case, the second sentence of MCL 691.1407(1) was simply inapplicable. *Pohutski*, 465 Mich at 689. The Court then held that, for cities, "the plain language of the governmental tort liability act does not contain a trespass-nuisance exception to governmental immunity." *Id.* at 689-690.

The *Pohutski* Court stated:

Because the state is not involved as a party in these cases, we need not explicate fully the meaning of the second sentence of [MCL 691.1407(1)]. We agree with Justice GRIFFIN [in his partial dissent in *Li v Feldt (After Remand)*, 434 Mich 584, 599; 456 NW2d 55 (1990), overruled in part by *Pohutski*] that, at most, the language of the second sentence requires an historical analysis of the *state's* sovereign immunity, but we have no occasion to undertake such an analysis here. Therefore, contrary to the dissent's assertion, we make no determinations regarding common-law exceptions to the state's governmental immunity. [*Pohutski*, 465 Mich at 688 n 1 (emphasis in original).]

Here, the "state," as defined in MCL 691.1401(c), is indeed involved. The question, then, is whether the second sentence of MCL 691.1407(1) allows plaintiffs to pursue the instant lawsuit or whether DOT is protected by governmental immunity.

We find no basis to conclude that a trespass-nuisance exception exists for claims against the state. Plaintiffs argue that the second sentence of MCL 691.1407(1) preserves a common-law exception to governmental immunity for trespass-nuisance, but they cite only *Hadfield* to support this position. *Hadfield* and the pertinent cases cited therein, however, did not address "sovereign immunity" (i.e., the immunity of *the state*). See *Pohutski*, 465 Mich at 682 (discussing sovereign immunity); see also *Myers v Genesee Co Auditor*, 375 Mich 1, 6; 133 NW2d 190 (1965) ("*Sovereign* immunity is a specific term limited in its application to the State and to the departments, commissions, boards, institutions, and instrumentalities of the State.").

"*So far as the State itself is concerned, the doctrine of sovereign immunity as it presently exists in Michigan is a creature of the legislature.* The doctrine has been modified by the legislature, abolished by the legislature, reestablished by the legislature, and further modified by the legislature." [*McDowell v State Hwy Comm'r*, 365 Mich

268, 271; 112 NW2d 491 (1961), quoting the brief of the Attorney General (emphasis added).]

The Legislature has not seen fit to expand upon this "creature of the legislature" by providing a trespass-nuisance exception to governmental immunity for claims against the state, and there is simply no indication that a common-law trespass-nuisance exception to *sovereign* immunity was in effect at the time of the enactment of MCL 691.1407(1).

In *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567; 363 NW2d 641 (1984), the Supreme Court examined MCL 691.1407(1). It first discussed the "ancient common-law concept" of sovereign immunity, *Ross*, 420 Mich at 597, and later stated:

> The first sentence of § 7 was intended to not only restore governmental immunity to non-sovereign governmental agencies, but to provide uniform treatment for state and local agencies. Furthermore, the affirmance of common-law sovereign immunity in the second sentence of § 7 was a clear directive that this Court henceforth could not . . . judicially abrogate the state's sovereign immunity. . . .
>
> Therefore, at the time § 7 was enacted, the state was immune from tort liability when it was engaged in the exercise or discharge of a governmental function, unless a statutory exception was applicable. This same immunity is reiterated by the first and second sentences of § 7.

* * *

> In summary, at the time § 7 was enacted and became effective, the state enjoyed immunity from tort liability at common law whenever it was engaged in the exercise or discharge of a governmental function, unless a statutory exception was applicable. This common-law sovereign immunity was codified by the second sentence of § 7. The immunity granted to the state by the first sentence of § 7 is

essentially coextensive with this common-law immunity. We note that this interpretation furthers the Legislature's intent to create uniform standards of liability for state and non-sovereign governmental agencies. [*Id.* at 605-606, 608.]

*Ross* clearly indicates that exceptions to sovereign immunity must be granted by the Legislature. Again, the Legislature has not provided such an exception for trespass-nuisance claims.[2] We thus hold that DOT was entitled to summary disposition with regard to plaintiffs' trespass-nuisance claim.

In their cross-appeal, plaintiffs claim that the trial court should not have granted defendants summary disposition with regard to the inverse-condemnation claim. In reviewing a motion for summary disposition under MCR 2.116(C)(10), this Court considers the pleadings, depositions, admissions, and other documentary evidence in the light most favorable to the nonmovant. *Morris & Doherty, PC v Lockwood*, 259 Mich App 38, 42 n 2; 672 NW2d 884 (2003). If the evidence fails to demonstrate a genuine issue of material fact, the movant is entitled to judgment as a matter of law. *Franchino v Franchino*, 263 Mich App 172, 181; 687 NW2d 620 (2004). A genuine issue of material fact exists when, after the court reviews the record in the light most favorable to the nonmovant, there remains an issue upon which reasonable minds could differ. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

---

[2] Plaintiffs contend that their trespass-nuisance claim rises to the level of an unconstitutional-taking claim and therefore cannot be barred by sovereign immunity. We need not decide whether such a taking claim would be exempt from sovereign immunity because, as noted later in this opinion, plaintiffs have failed to set forth the necessary allegations to constitute an unconstitutional-taking claim.

" 'Eminent domain' or 'condemnation' is the power of a government to take private property." *Silver Creek Drain Dist v Extrusions Div, Inc*, 468 Mich 367, 373; 663 NW2d 436 (2003). The United States Constitution precludes the federal government from taking private property unless it is taken for a public use and with just compensation. US Const, Am V. Similarly, the Michigan Constitution requires that "[p]rivate property shall not be taken for public use without just compensation." Const 1963, art 10, § 2. Additionally, MCL 213.55(1) requires that, in the event the parties fail to agree with regard to the purchase of the property, courts ascertain and determine just compensation to be made for condemned property.

"An inverse or reverse condemnation suit is one instituted by a landowner whose property has been taken for public use without the commencement of condemnation proceedings." *Electro-Tech, Inc v H F Campbell Co*, 433 Mich 57, 88-89; 445 NW2d 61 (1989) (citation and quotation marks omitted). "While there is no exact formula to establish a de facto taking, there must be some action by the government specifically directed toward the plaintiff's property that has the effect of limiting the use of the property." *Dorman v Clinton Twp*, 269 Mich App 638, 645; 714 NW2d 350 (2006) (citation and quotation marks omitted). Generally, a plaintiff alleging a de facto taking or inverse condemnation must establish (1) that the government's actions were a substantial cause of the decline of the property's value and (2) that the government abused its powers in affirmative actions directly aimed at the property. *Hinojosa v Dep't of Natural Resources*, 263 Mich App 537, 548; 688 NW2d 550 (2004). "Further, a plaintiff alleging inverse condemnation must prove a casual connection between the government's action and the alleged damages." *Id*. Additionally,

[a]ny injury to the property of an individual which deprives
the owner of the ordinary use of it is equivalent to a taking,
and entitles him to compensation. So a partial destruction
or diminution of value of property by an act of government,
which directly and not merely incidentally affects it, is to
that extent an appropriation. [*Peterman v Dep't of Natural
Resources*, 446 Mich 177, 190; 521 NW2d 499 (1994)
(citations and quotation marks omitted).]

In cases involving a "legalized nuisance," e.g., "the
persistent passing of trains on a railroad, or planes in
the air, or vehicles on the road," a plaintiff must allege
that the property is directly affected in a manner that is
unique or peculiar relative to the property of other
similarly situated persons. *Spiek v Dep't of Transp*, 456
Mich 331, 345; 572 NW2d 201 (1998).

In *Spiek*, 456 Mich at 334, the plaintiffs' residence
abutted the service drive to an interstate highway, and
they initiated an inverse-condemnation action against
the defendant, "alleging that defendant's actions in
locating the service drive adjacent to their property had
'so interfered with Plaintiffs' quiet use and enjoyment
of the property as to render it worthless, and to consti-
tute a taking of property for public purpose without
payment of just compensation . . . .' " The trial court
granted the defendant's motion for summary disposi-
tion " 'as a matter of public policy.' " *Id*. at 336. This
Court reversed, concluding that the plaintiffs should
have been afforded an opportunity to establish that
their use and enjoyment of the property was affected
detrimentally to a degree greater than the public. *Id*.
The Supreme Court granted leave to appeal "to decide
whether noise, dust, vibration, and fumes experienced
by owners of property along an interstate freeway
constitute a taking of a recognized property interest
where the effects alleged are not unique or peculiar in
character." *Id*. at 332.

The Supreme Court opined that if "a legalized nuisance affects all in its vicinity in common, damages generally are not recoverable under just-compensation theory" because such common injuries are "incidental effects not amounting to an appropriation." *Id.* at 345. The Court discussed the common-law doctrine of *damnum absque injuria*: " 'Loss, hurt, or harm without injury in the legal sense; that is, without such breach of duty as is redressible by a legal action. A loss or injury which does not give rise to an action for damages against the person causing it.' " *Id.* at 346, quoting Black's Law Dictionary (6th ed).

The *Spiek* Court noted that if

> the plaintiff alleges that the property is directly affected in a manner that is unique or peculiar in comparison to the property of other similarly situated persons, the plaintiff states a claim for which the relief sought may be granted under well-established principles for proving the right to compensation. [*Spiek*, 456 Mich at 346.]

The Court specifically explained:

> The right to just compensation, in the context of an inverse condemnation suit for diminution in value caused by the alleged harmful affects to property abutting a public highway, exists only where the landowner can allege a unique or special injury, that is, an injury that is different in kind, not simply in degree, from the harm suffered by all persons similarly situated. While the Michigan courts have not had the opportunity to address this issue directly in recent years, the overwhelming weight of foreign authority supports this conclusion, as do contemporary public policy considerations. [*Id.* at 348.]

The Court opined further:

> In the context of traffic flow, a degree of harm threshold, as opposed to the well-established difference in kind threshold, would be unworkable both in a practical sense

and from the standpoint of public policy because it would depend on the amount of traffic traveling a particular highway at a particular time that may change over time because of factors unrelated to and out of the control of the state. For example, demographic changes and economic changes affecting commercial and industrial development may determine the degree of harm, rather than the actual location of the highway in a particular place by the state. To require the state to litigate every case in which a person owning land abutting a public highway feels aggrieved by changing traffic conditions would wreak havoc on the state's ability to provide and maintain public highways and place within the judicial realm that which is inappropriate for judicial remedy. Where harm is shared in common by many members of the public, the appropriate remedy lies with the legislative branch and the regulatory bodies created thereby, which participate extensively in the regulation of vibrations, pollution, noise, etc., associated with the operation of motor vehicles on public highways. Only where the harm is peculiar or unique in this context does the judicial remedy become appropriate. [*Id.* at 349.]

The Supreme Court concluded that the defendant was entitled to summary disposition because the plaintiffs had failed to overcome the doctrine of *damnum absque injuria* by failing to "alleg[e] harm of a character different from that suffered by all living in similar proximity to a highway." *Id.* at 350. The Court found that the "plaintiffs' complaint alleges the same type of incidental and consequential harm as is experienced by all persons similarly situated to plaintiffs in that they reside near a public highway." *Id.* The Court further rejected the plaintiffs' assertion "that recovery was available if the harm suffered merely differed in degree from the inconvenience experienced by the public at large." *Id.* The Court ultimately held:

The just-compensation requirement in the Michigan Constitution does not require the state to compensate every property owner living in proximity to a public high-

way for the normal inconveniences associated therewith. The plaintiff states a claim for which relief may be granted only where the plaintiff alleges harm of a unique or peculiar kind. We reverse the decision of the Court of Appeals and reinstate the trial court's order granting defendant's motion for summary disposition. [*Id.* at 350-351.]

In this case, defendants used salt as a means to prevent ice from building up on public highways and roads. Notably, plaintiffs allege that the harm is caused not by the act of administering salt to the highways and roads, but as a result of traffic causing salt spray to ultimately invade plaintiffs' property, thereby harming their blueberry crops. Ottawa County formed the Ottawa County Road Salt Commission to identify strategies to modify Ottawa County's winter road maintenance to prevent further environmental impacts related to the application of road salt. A survey was conducted, which estimated losses to blueberry production for 2003. The survey looked at 16 property owners with 32 farms. Fifteen farms did not provide any information regarding losses. The other 17 farms listed losses ranging from $3,000 to $200,000. Seven farms listed losses of less than $10,000; seven farms listed losses between $10,000 and $50,000; one farm listed losses of $80,000; one farm listed losses of $120,000; and one farm listed losses of $200,000. The road salt commission noted that the environmental impact from road salt received attention after blueberry growers reported damage to blueberry bushes near roadways. The road salt commission also acknowledged:

The threat of increasing road salt usage to the blueberry industry is not the only cause for concern. If current winter road maintenance practices are not changed, the damage observed to roadside trees and ornamental plants could become more widespread. Other impacts could also become

more pronounced. Elevated levels of chloride, for example, have been detected in irrigation ponds adjacent to roadways. Rising chloride levels have also been found in groundwater in Illinois, as well as in the Great Lakes. While the chloride levels detected in groundwater and in the Great Lakes are not yet believed to be harmful to humans, some research indicates that these levels have already altered our ecosystems. For instance, researchers have identified the increased salinity in the Great Lakes as a factor in the migration of some exotic species to this region.

The road salt commission's report, Recommendations for Salt Management, generally focused on the environmental impact on blueberry crops. Nevertheless, as noted in the report's facts and findings regarding impacts of road salt usage:

> Other environmental impacts, including damage to other types of roadside vegetation and water resources, are occurring or suspected of occurring as a result of road salt usage. The effect of road salt exposure on trees is explained in an article which appeared in *Michigan Landscape Magazine* (See Attachment K). The impact on water resources is documented in Table 1 and Figures 1-2.

The road salt commission also provided measures designed to eliminate the damaging effects of road salt exposure to blueberries by establishing windbreaks using salt resistant tree species, placing the first row of blueberry plantings at least 300 feet from the road, digging irrigation ponds at the back of the field away from roads, and improving drainage around fields.

Certainly, plaintiffs have suffered some kind of loss as a result of the application of the road salt; however, their claims are precluded under the common-law doctrine of *damnum absque injuria*. See *Spiek*, 456 Mich at 346. Ultimately, the harm is akin to that resulting from "the amount of traffic traveling a particular highway at

a particular time . . . ." See *id.* at 349. The by-product pollution is suffered by all people owning land adjacent to the salted roads, and the harm-causing factors are "unrelated to and out of the control of the state." *Id.* "[A]cts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision." *Case v Saginaw*, 291 Mich 130, 141; 288 NW 357 (1939) (citation and quotation marks omitted). Thus, such acts do not entitle the property owner to compensation from the state. *Id.* at 141-142.

Plaintiffs maintain that their injury is different from other similarly situated property owners. Plaintiffs emphasize the loss of their cash crop as compared to other property owners' lawns, ornamental plantings, or incidental roadside vegetation. However, plaintiffs' injury clearly is merely of a different *degree* than that suffered by the public at large and therefore is not actionable. *Spiek*, 456 Mich at 350.

Affirmed in part, reversed in part, and remanded for entry of judgment in favor of DOT. We do not retain jurisdiction.

MURRAY, J., concurred.

BECKERING, J. (*concurring*). I concur in the result reached by the majority in this matter, but write separately to elaborate on the majority's analysis and why we are compelled to dismiss plaintiffs' claims.

In reaching its conclusion that there is no trespass-nuisance exception to the doctrine of sovereign immunity, the majority relies in part on *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567; 363 NW2d 641

(1984), which predates *Pohutski v City of Allen Park*, 465 Mich 675; 641 NW2d 219 (2002). In *Pohutski*, our Supreme Court held that the first sentence of MCL 691.1407(1) contains no trespass-nuisance exception to governmental immunity for cities. *Pohutski*, 465 Mich at 689-690. MCL 691.1407(1) provides:

> Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided in this act, this act does not modify or restrict the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed.

The *Pohutski* Court cited *Ross*, a pre-*Hadfield*[1] case, for the propositions that because the state created the courts, it is not subject to the courts, that the governmental tort liability act " 'was intended to provide uniform liability and immunity to both state and local governmental agencies' when involved in a governmental function," and that by enacting the second sentence of MCL 691.1407(1), the Legislature meant to ensure that " 'by restoring to municipal corporations immunity for governmental functions and making uniform the immunity of all governmental entities for governmental functions [in the first sentence], it was not thereby waiving the state's common-law absolute sovereign immunity for non-governmental functions . . . .' " *Pohutski*, 465 Mich at 681-683, 693, citing and quoting *Ross*, 420 Mich at 598, 605, 614, and *Ross*, 420 Mich at 669 (LEVIN, J., dissenting in part). The Court specifically refrained, however, from interpreting or applying the second sentence of MCL 691.1407(1), stating that the second sentence did not apply because

---

[1] *Hadfield v Oakland Co Drain Comm'r*, 430 Mich 139; 422 NW2d 205 (1988), overruled by *Pohutski*, 465 Mich at 695.

the state was not a party, and therefore, it would not "explicate fully the meaning of the second sentence" or make any "determinations regarding common-law [trespass-nuisance] exceptions to the state's governmental immunity." *Pohutski*, 465 Mich at 688 n 1, 689. The Court also stated that, "at most, the language of the second sentence requires an historical analysis of the state's sovereign immunity, but we have no occasion to undertake such an analysis here." *Id.* at 688 n 1 (emphasis omitted). In concluding that the second sentence contains no trespass-nuisance exception to sovereign immunity, the majority in this case also cites *Ross*, reiterating and expanding upon the propositions previously cited in *Pohutski*. Although *Ross* predated *Pohutski* and was superseded in part on other grounds by MCL 691.1407(5), the portions of *Ross* cited in the majority opinion remain good law.

I agree with the majority's outcome primarily, however, because an historical analysis of sovereign immunity before July 1, 1965, reveals no indication that a common-law exception existed with respect to trespass-nuisance claims against the state. As noted by the majority, plaintiffs cite only *Hadfield*, 430 Mich 139, in support of their contention that the second sentence of MCL 691.1407(1) preserves the common-law exception for trespass-nuisance claims against the state. The *Hadfield* Court conducted an extensive historical analysis in its decision; however, the 13 cases referenced in that decision do not shed any light on the concept of sovereign immunity. Significantly, the defendants in those cases, which focus primarily on "nuisance" claims, fall under the "political subdivision" definition of MCL 691.1401(b), not the "state" definition of MCL 691.1401(c). See *Pennoyer v Saginaw*, 8 Mich 534 (1860) (the defendant was a city); *Sheldon v Village of Kalamazoo*, 24 Mich 383 (1872) (the defendant was a village);

*Ashley v Port Huron*, 35 Mich 296 (1877) (the defendant was a city); *Rice v City of Flint*, 67 Mich 401; 34 NW 719 (1887) (the defendant was a city); *Seaman v City of Marshall*, 116 Mich 327; 74 NW 484 (1898) (the defendant was a city); *Ferris v Detroit Bd of Ed*, 122 Mich 315; 81 NW 98 (1899) (the defendant board of education was a political subdivision); *Kilts v Kent Co Bd of Supervisors*, 162 Mich 646; 127 NW 821 (1910) (the defendant county board of supervisors was a political subdivision); *Attorney General, ex rel Wyoming Twp v Grand Rapids*, 175 Mich 503; 141 NW 890 (1913) (litigation between municipalities); *Donaldson v City of Marshall*, 247 Mich 357; 225 NW 529 (1929) (the defendant was a city); *Robinson v Wyoming Twp*, 312 Mich 14; 19 NW2d 469 (1945) (the defendant was a township); *Rogers v Kent Co Bd of Co Rd Comm'rs*, 319 Mich 661; 30 NW2d 358 (1948) (the defendant was a political subdivision); *Defnet v Detroit*, 327 Mich 254; 41 NW2d 539 (1950) (the defendant was a city); *Herro v Chippewa Co Rd Comm'rs*, 368 Mich 263; 118 NW2d 271 (1962) (the defendant was a political subdivision). As such, the defendants in those cases could not be afforded sovereign immunity. See *Myers v Genesee Co Auditor*, 375 Mich 1, 6; 133 NW2d 190 (1965) ("Sovereign immunity is a specific term limited in its application to the State and to the departments, commissions, boards, institutions, and instrumentalities of the State.") (emphasis omitted). Plaintiffs cite no caselaw establishing that any exceptions to governmental immunity with respect to political subdivisions before 1965 are to be imputed to sovereign immunity as well.

Additionally, I note that footnote 2 of the majority opinion briefly addresses plaintiffs' argument that their trespass-nuisance claim rises to the level of an unconstitutional-taking claim and is, therefore, exempt from sovereign immunity. The footnote states: "We need

not decide whether such a taking claim would be exempt from sovereign immunity because, as noted later in this opinion, plaintiffs have failed to set forth the necessary allegations to constitute an unconstitutional-taking claim." While I agree with this statement, it is worth noting that while trespass-nuisance and unconstitutional-taking claims are similar, they remain distinct actions.

In *Hinojosa v Dep't of Natural Resources*, 263 Mich App 537; 688 NW2d 550 (2004), this Court discussed the distinction between claims for trespass-nuisance and unconstitutional taking. The *Hinojosa* Court first discussed the applicability of *Buckeye Union Fire Ins Co v Michigan*, 383 Mich 630; 178 NW2d 476 (1970),[2] noting:

---

[2] In *Buckeye*, 383 Mich at 632, on April 10, 1963, a fire started in buildings owned by the state and spread to neighboring properties. The plaintiffs sued the state, asserting that the condition of the buildings "constituted a nuisance to the premises and properties insured by plaintiffs." *Id.* The trial court concluded that there was a nuisance, but that the state had sovereign immunity as to the nuisance action. *Id.* at 633. In reversing the trial court and the Court of Appeals, our Supreme Court essentially converted the plaintiffs' nuisance claim to an unconstitutional-taking claim. The Court noted that sovereign immunity does not apply to taking claims, *id.* at 641, and justified its holding on public policy grounds, stating: "Courts of other states have applied similar provisions in their state constitutions to factual situations corresponding to those of this case," *id.* at 642. The Court quoted the Massachusetts Supreme Judicial Court:

"This private nuisance was nonetheless one merely because the city had acquired the lot through foreclosure for nonpayment of taxes. Public policy in a civilized community requires that there be someone to be held responsible for a private nuisance on each piece of real estate, and, particularly in an urban area, that there be no oases of nonliability where a private nuisance may be maintained with impunity." [*Id.* at 643-644, quoting *Kurtigian v City of Worcester*, 348 Mass 284, 291; 203 NE2d 692 (1965).]

Our Supreme Court held that "[t]here is no sovereign immunity applicable to a situation of nuisance as we have in this case." *Buckeye*, 383 Mich at 644.

The liability imposed on the state [in *Buckeye*] was for the tort of nuisance, not to justly compensate an owner for the taking of private property for public use. Nevertheless, the *Buckeye* Court relied on the Taking Clause as its rationale for concluding that common-law sovereign immunity did not shield the state from liability for nuisance. [*Hinojosa*, 263 Mich App at 543.]

This Court also noted:

Regarding *Buckeye*, the *Hadfield* Court observed that, "although the plaintiff had alleged nuisance and this Court found nuisance, the holding was premised on the fact that an unconstitutional taking had occurred," and that the *Buckeye* Court treated the two causes of action as synonymous. . . . But the Court also noted that "[d]irect reliance on [the Taking Clause] should not be confused with the assertion of the trespass-nuisance exception . . . [because] other trespass-nuisance cases that cited the taking provision of the constitution merely employed that provision as a rationale for the judicially created rule that would impose liability in a tort setting involving governmental immunity." . . . Our Supreme Court later would again emphasize that a constitutional taking and the tort of trespass-nuisance are distinct actions. [*Id.* at 545-546, quoting *Hadfield*, 430 Mich at 165 n 10, 168.]

This Court underscored that although judicial decisions have closely associated trespass-nuisance with the Taking Clause, the former action remains a tort. *Hinojosa*, 263 Mich App at 546. See also *Peterman v Dep't of Natural Resources*, 446 Mich 177, 206-207; 521 NW2d 499 (1994) (a constitutional taking and the tort of trespass-nuisance are distinct actions).

The *Hinojosa* Court concluded:

In the case at bar, the trial court correctly dismissed plaintiffs' tort claim of trespass-nuisance because our Supreme Court in *Pohutski* overruled *Hadfield*, finding that "the plain language of the governmental tort liability act does not contain a trespass-nuisance exception to govern-

mental immunity." *Pohutski, supra* at 689-690. But the majority in *Pohutski* pointedly declined to address whether facts that previously might have supported liability for a trespass-nuisance could establish an unconstitutional taking. The *Pohutski* Court stated:

"The parties have addressed whether trespass nuisance is not a tort within the meaning of the governmental immunity statute, but rather an unconstitutional taking of property that violates Const 1963, art 10, § 2. The trial courts in these cases have yet to address the taking claims. Therefore, we decline to discuss those claims at this time." [*Id.* at 699.]

Thus, although presented the opportunity, our Supreme Court declined to adopt Justice KELLY's views that *Buckeye* "acknowledged that the trespass-nuisance exception has a constitutional basis," and that "[g]overnmental immunity is not a defense to a constitutional tort claim, hence not to a claim based on trespass-nuisance." *Pohutski, supra* at 709 (KELLY, J., dissenting), citing *Thom v State Hwy Comm'r*, 376 Mich 608, 628; 138 NW2d 322 (1965). We conclude, therefore, that the issue whether trespass-nuisance as alleged here may constitute a constitutional taking was not decided in *Buckeye*. Hence, we must consider other decisions addressing the application of the Taking Clause. [*Hinojosa*, 263 Mich App at 547-548.]

The *Hinojosa* Court held that the plaintiffs failed to state a cause of action for a " 'taking' " or " 'inverse condemnation.' " *Id.* at 548.

In sum, courts of this state have held that trespass-nuisance and unconstitutional taking are distinct actions. Our Supreme Court has not yet addressed whether facts that might establish liability for trespass-nuisance could establish an unconstitutional-taking claim. See *id.* at 547. It is clear, however, that while our Legislature has the constitutional authority to modify or abolish the ability to bring trespass-nuisance claims against the state, an unconstitutional-taking action

may not be limited except as provided by the Michigan Constitution. [*Id.* at 546.] Thus, if plaintiffs alleged a taking, they may have a cause of action. As stated by the majority, however, we need not address that issue because plaintiffs failed to set forth the allegations necessary to establish an unconstitutional taking.

Finally, in regard to plaintiffs' inverse-condemnation claim, I agree with the majority's conclusion that the difference between the injuries suffered by plaintiffs and similarly situated property owners is best categorized as one of degree, and not of kind, and therefore, plaintiffs' claim must fail. I acknowledge, however, that this is a close call requiring careful consideration.

The majority compares this case to *Spiek v Dep't of Transp*, 456 Mich 331, 333-334; 572 NW2d 201 (1998), wherein the plaintiffs brought an inverse-condemnation action against the defendant for locating an interstate highway service drive adjacent to their residential property. The plaintiffs' complaint alleged that the service drive produced

> "an essential change in the neighborhood [that] . . . violated restrictive covenants in the subdivision . . . [and] caused grave and serious damage to the value of the . . . property by increasing dramatically the levels of noise, vibrations, pollution and dirt in the once-residential area . . . [thus] destroying the desirability of the . . . property as an area for living and . . . destroying the acceptability of the property for residential purposes." [*Id.* at 334.]

As noted in the majority opinion for this case, the *Spiek* Court held that damages are not recoverable for a "legalized nuisance" such as "the persistent passing of trains on a railroad, or planes in the air, or vehicles on the road" unless "the plaintiff alleges that the property is directly affected in a manner that is unique or peculiar in comparison to the property of other simi-

larly situated persons . . . ." *Id.* at 345-346. The plaintiff must allege an injury "different in kind, not simply in degree, from the harm suffered by all persons similarly situated." *Id.* at 348. Significantly, the *Spiek* Court further stated:

> In the context of traffic flow, a degree of harm threshold, as opposed to the well-established difference in kind threshold, would be unworkable both in a practical sense and from the standpoint of public policy because it would depend on the amount of traffic traveling a particular highway at a particular time that may change over time because of factors unrelated to and out of the control of the state. For example, demographic changes and economic changes affecting commercial and industrial development may determine the degree of harm, rather than the actual location of the highway in a particular place by the state. To require the state to litigate every case in which a person owning land abutting a public highway feels aggrieved by changing traffic conditions would wreak havoc on the state's ability to provide and maintain public highways and place within the judicial realm that which is inappropriate for judicial remedy. Where harm is shared in common by many members of the public, the appropriate remedy lies with the legislative branch and the regulatory bodies created thereby, which participate extensively in the regulation of vibrations, pollution, noise, etc., associated with the operation of motor vehicles on public highways. Only where the harm is peculiar or unique in this context does the judicial remedy become appropriate. [*Id.* at 349.]

The *Spiek* Court reversed the decision of the Court of Appeals and reinstated the Court of Claims order granting summary disposition to the defendant, concluding that the plaintiffs had failed to state a claim upon which relief could be granted because they did not allege harm to their property that differed "in kind from the harm suffered by all living in proximity to a public highway in Michigan." *Id.* at 350. Rather, the plaintiffs' complaint alleged "the same type of incidental and consequential

harm as is experienced by all persons similarly situated to plaintiffs in that they reside near a public highway." *Id.*

In this case, plaintiffs allege that the spreading of salt on public highways and primary county roads adjacent to their blueberry fields ultimately results in reduced blueberry production. According to plaintiffs, after the salt is spread, passing vehicles and the wind throw salt water onto their fields, causing damage to blueberry bushes and reduced production from those bushes. The spreading of salt on the roads may be categorized as a "legalized nuisance" comparable to locating a highway service drive near residential property, resulting in increased levels of noise, vibration, pollution, and dirt from traffic flow. See *id.* at 345. Therefore, like the plaintiffs in *Spiek*, plaintiffs in this case must allege an injury "different in kind, not simply in degree, from the harm suffered by all persons similarly situated." *Id.* at 348. Plaintiffs' injury must be unique or peculiar. See *id.* at 346.

As our Supreme Court articulated in *Spiek*, it would be unworkable to apply a degree-of-harm threshold, rather than a difference-in-kind threshold, in the context of traffic flow. *Id.* at 349. It would also be unworkable under the facts of this case. The road commissions responsible for spreading salt do so to prevent the formation of ice on public highways and primary county roads during the winter months. The amount of salt spread on the roads directly correlates to the severity of the weather. According to plaintiffs, once the salt is spread, salt water is thrown onto their fields by passing vehicles and the wind. Thus, the degree of harm suffered by plaintiffs is largely dependent on the weather over the course of the winter, which is out of defendants' control, and traffic flow, which may also be

affected by factors out of defendants' control. Requiring the state and county road commissions to litigate every case in which vegetation is damaged by salt spray would seriously impede their ability to protect Michigan's citizens from the hazards presented by ice-covered roads. I agree with the *Spiek* Court that under facts such as these, a legislative remedy is more appropriate than a judicial remedy. The legislative branch is the appropriate branch to weigh the safety hazards presented by ice-covered roads against the environmental and economic impact of salt usage and, if deemed necessary, order that the spreading of salt be reduced or replaced with an alternative method of deicing the roads.

Plaintiffs claim that the harm they suffer is of a different kind than the harm suffered by those similarly situated. Plaintiffs liken their situation to that experienced by the respondents in *United States v Causby*, 328 US 256, 258-259; 66 S Ct 1062; 90 L Ed 1206 (1946), wherein the persistent intrusion of low-flying army and navy aircraft accessing the glide path of a runway by passing approximately 83 feet over the respondents' property, 67 feet above their house, 63 feet above the barn, and 18 feet above the highest tree forced the respondents to give up using their property as a commercial chicken farm. The United States Supreme Court held that such conduct (which involved traveling below the navigable airspace of the United States)[3] amounted to a physical invasion of the property entitling the respondents to compensation for the taking of their property. *Id.* at 265-267. Plaintiffs argue that the respondents in *Causby* prevailed because their harm

[3] "[N]avigable airspace" was then defined as " 'airspace above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Authority.' " *Causby*, 328 US at 263, quoting 49 USC 180.

was distinguishable from others who suffered the mere normal inconveniences of modern air travel over their lands at higher altitudes. Plaintiffs contend that, like the respondents in *Causby*, they have suffered a unique injury, namely the destruction of their crops hundreds of feet from the roadsides as compared to other property owners who have suffered the incidental burning of some of their lawns. But, unlike the respondents in *Causby*, plaintiffs do not suggest that their properties have been singled out in some way. Rather, they claim that the harm they suffer—damage to their blueberry bushes—is unique because it is economic in nature. Plaintiffs engage in commercial blueberry production, and when their bushes are damaged and rendered less productive, the damage affects plaintiffs' economic viability. While there is merit to the argument that the harm suffered by plaintiffs is different from that suffered by a property owner who, for example, has lost merely a section of lawn or decorative plantings as a result of salt spray, I must agree with the majority that the difference between the injuries is best categorized as one of degree, and not of kind. First, as noted in the majority opinion, there is evidence that blueberry bushes are not the only type of vegetation affected by the spreading of salt on the roads. The report issued by the road salt commission indicates that salt usage damages roadside trees and ornamental plants. It may also negatively affect our ecosystems by raising the level of chloride in nearby bodies of water. Therefore, it is reasonable to presume that persons who use their roadside properties for the commercial production of trees or ornamental plants, or any other type of commercial enterprise that may be negatively affected by the spreading of salt on the roads, would suffer the same kind of injury as plaintiffs. Moreover, in cases where a property owner loses merely decorative plant-

ings or any other type of vegetation that was not intended to produce a profit, the owner loses not only the value of that particular vegetation, which may be substantial if, for example, the owner has costly ornamental plantings along the roadside, but also the option to use the roadside property to grow any new vegetation that would be damaged by salt spray, including cash crops.

Because the harm suffered by plaintiffs differs only in degree, and not in kind, from the harm suffered by those similarly situated, I agree with the majority that plaintiffs' inverse-condemnation claim must fail.