RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0135p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JOE BRUNEAU, DAVID PHILLIPS, DANA RALKO,
PATRICIA RALKO, MARY RANDALL, OSRO RANDALL,
JAMES MRDUTT, and ALICIA MRDUTT, individually and
on behalf of all those similarly situated,

*Plaintiffs-Appellants*,

*v.*

MICHIGAN DEPARTMENT OF ENVIRONMENT, GREAT
LAKES, AND ENERGY, et al.,

*Defendants*,

MIDLAND COUNTY, MICHIGAN; GLADWIN COUNTY,
MICHIGAN,

*Defendants-Appellees*.

No. 23-1761

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:20-cv-11588—Thomas L. Ludington, District Judge.

Argued: June 13, 2024

Decided and Filed: June 20, 2024

Before: SUTTON, Chief Judge; McKEAGUE and BUSH, Circuit Judges.

───────────────

## COUNSEL

ARGUED: Daniel J. Pifko, MCALPINE PC, Auburn Hills, Michigan, for Appellants. Douglas
J. Curlew, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for
Appellees. **ON BRIEF:** Mark L. McAlpine, Douglas W. Eyre, Mark W. Oszust, MCALPINE
PC, Auburn Hills, Michigan, for Appellants. Douglas J. Curlew, Kevin J. Campbell,
CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellees.

————————————

**OPINION**

————————————

SUTTON, Chief Judge.  Heavy rains prompted the Edenville Dam in Michigan to fail, flooding several cities downstream.  Eight affected landowners sued Midland and Gladwin Counties, alleging a taking under the federal and state constitutions.  The district court granted summary judgment to the counties.  We affirm.

I.

Built in 1924, the Edenville Dam facilitated the creation of a hydropower plant on the Tittabawassee River in the central part of the lower peninsula of Michigan.  From the beginning, the dam faced flood control issues.  Efforts to remedy some of the problems gained momentum when the Federal Energy Regulatory Commission began overseeing the dam's licensing in the 1980's.  In 1998, the Commission granted the first license with respect to the Edenville Dam to the Wolverine Power Corporation.  After granting the license, the Commission focused its regulatory efforts on improving the dam's spillways for surplus water.  The various companies that owned the dam over the years had inconsistent records in complying with the relevant regulations.  All of this led the Commission to revoke the existing owner's license in September 2018 and transfer regulatory authority over the dam to the Michigan Department of Environment, Great Lakes, and Energy.

In compliance with the Michigan Natural Resources and Environmental Protection Act, Midland and Gladwin Counties assembled a task force to manage the lake above the dam.  *See* Mich. Comp. Laws Ann. § 324.30701 et seq. (West 1995).  Under Michigan law, any entity with "delegated authority" to manage a lake, such as the task force, must "maintain" a "court-determined normal [water] level."  *Id.* § 324.30702(3).  Consistent with that law, the counties in 2019 filed a petition in the Midland County Circuit Court to keep the lake levels where they had been for more than nine decades.  The counties hoped to "protect the public's health, safety, and welfare, to best preserve the natural resources of the state, and to preserve and protect the value of property around the Lakes."  R.56-3 at 4.  On May 28, 2019, after considering the past lake

levels and the evidence offered by "all interested persons," the state court granted the counties' request.  Mich. Comp. Laws Ann. § 324.30707(4) (West 1995).

Nearly a year later, on May 19, 2020, several days of historic rainfall raised the water level three feet above its previous maximum, triggering the dam's failure.  As the dam's left embankment fell, forty thousand acre-feet of water rushed forward.  The flood overwhelmed another dam downstream, forcing eleven thousand residents to evacuate.  Their homes and property remained underwater for several days and suffered extensive damage.

The dam's demise spawned several lawsuits, including this one.  *See, e.g.*, *Mich. Dep't of Env't v. Mueller*, No. 1:20-cv-528, 2023 WL 7162918, at *1, *4 (W.D. Mich. Oct. 6, 2023) (order); *Krieger v. Dep't of Env't, Great Lakes, & Energy*, No. 359895, 2023 WL 5808605, at *1 (Mich. Ct. App. Sept. 7, 2023).  In this lawsuit, the claimants maintain that the counties violated the federal and state takings clauses when the floodwaters ruined their basements, first floors, and lots of personal possessions.  *See* 42 U.S.C. § 1983.  In their view, the counties "took" their properties by urging the state court to maintain the dam's historic water levels, all while knowing that its spillway system ran the risk of overflowing.

While this lawsuit and others remained pending, the Federal Energy Regulatory Commission engaged an independent forensic team to sort out the cause of the dam's collapse. The ensuing report revealed an unexpected answer: "static liquefaction."   R.56-10 at 6. Undetected defects since the dam's construction led to a sudden loss of soil strength around the base of the dam during the rainfall.  Saturated sands prompted the slope to collapse, compromising the dam's structure.  The onslaught of water, put another way, did not spill over the top of the dam as the landowners had hypothesized; it caused the undergirding of the slope to give in.

The counties sought summary judgment.  Over the landowners' objection, the district court granted the motion, concluding that the counties' efforts to keep the water behind the dam at existing levels did not show that they intended to flood the downstream properties and "take" their land.

II.

At stake is whether the counties' efforts to maintain existing water levels behind the Edenville Dam amounted to a taking under the federal or state constitutions.

*Federal law*.  The Fifth Amendment says that private property shall not "be taken for public use, without just compensation."  U.S. Const. amend. V.  The guarantee applies to the States through the Fourteenth Amendment.  *First Eng. Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 310 n.4 (1987).  A taking amounts to a government's appropriation of property without paying for it.  *See Knick v. Township of Scott*, 588 U.S. 180, 189 (2019).  The duration and character of a government's appropriation of property, or intrusion on it, determine whether it amounts to a taking.  *See Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 38–39 (2012); *see also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427–28 (1982); *Sanguinetti v. United States*, 264 U.S. 146, 149 (1924).

When a government bears responsibility for flooding private property, it may be liable for a taking *or* a tort.  On the one side of the line:  If the government permanently and intentionally floods a property, the courts treat it as a taking.  Consider a few examples.  In one case, a State intentionally increased the lake waters behind a dam and indefinitely subsumed a farmer's land.  That, the Supreme Court held, rose to the level of a taking.  *Pumpelly v. Green Bay Co.*, 80 U.S. (13 Wall.) 166, 176, 181 (1871).  In another case, the government built a lock and dam that subjected the land below it to inevitable and frequent overflows.  That, the Court also held, amounted to a taking.  *United States v. Cress*, 243 U.S. 316, 327–28 (1917).  A taking occurred because the government intended the invasion, or, at the very least, knew that intrusion was "the direct, natural, or probable result of an authorized activity."  *Golf Vill. N., LLC v. City of Powell*, 14 F.4th 611, 621 (6th Cir. 2021) (quotation omitted).

On the other side of the line:  An unintended, temporary flood attributable to state action does not amount to a taking, even though it may rise to the level of a tort.  *Cf. Ark. Game & Fish Comm'n*, 568 U.S. at 36–39.  Consider a few examples.  No taking occurred when the federal government built a canal with an inadequate spillway, which briefly flooded nearby properties during especially heavy rains but did not prevent their long-term use.  *Sanguinetti*, 264 U.S. at 147–49.  The plaintiff failed to show that the flooding was a purposeful or necessary result of the

canal's construction. *Id.* at 147–50. Any damage was "indirect and consequential, for which no implied obligation on the part of the government c[ould] arise." *Id.* at 150. No taking likewise occurred when a government did not have the "foresight" to see a lake water's "destination nor purpose to appropriate the properties" near a lake. *John Horstmann Co. v. United States*, 257 U.S. 138, 146 (1921). A government's negligent infliction of injury on property does not by itself a taking make. *See Golf Vill. N., LLC*, 14 F.4th at 621; *Bd. of Supervisors of Issaquena Cnty. v. United States*, 84 F.4th 1359, 1365 (Fed. Cir. 2023).

Gauged by this test and these comparisons, the counties did not take the landowners' properties. All that the counties' petition before the state court did was *preserve* the lake depth at the same level that had existed for roughly a century. Wise or not, that action does not show that they meant to flood the downstream properties. Think about *Sanguinetti* to see why. There, too, the government at worst negligently maintained a dam that flooded the plaintiffs' properties after a sustained rain. 264 U.S. at 147, 150. No taking occurred because the government did not intend to flood the downriver properties. *See id.* Today's facts are even easier to deal with. The counties played no part in regulating or controlling the dam's infrastructure. All they did was petition to keep the water levels behind the dam at the same level that had existed since the dam's creation and that the property owners around the dam had become accustomed to.

That's all one needs to know to resolve the federal takings claim. But if there were doubt about that conclusion, it's worth adding that the lake levels had little to do with the dam's collapse. As the Federal Energy Regulatory Commission's independent forensic team determined, it was soil vulnerabilities, in place since the dam's construction, that caused the collapse. No one in a hundred years had spotted this static liquefaction threat. On this record, any flood risks flowing from the government's petition to maintain the existing water levels could not remotely be attributable to government design, direction, or intent. *See Golf Vill. N., LLC*, 14 F.4th at 620–21. No taking occurred as a matter of federal law.

The landowners try to head off this conclusion in several ways. They maintain that the counties "set into motion the destructive forces that caused the Dam collapse" by leaving the lake levels where they were, all while "knowing that the Dam lacked adequate spillway capacity." Appellants' Br. 8. But this contention overlooks two realities. One, even if lowering

the water level might have lowered the risk of flooding, the failure to do so does not show intentional flooding. Recall *Sanguinetti*. As in that case, the counties might have taken a more cautious approach to flood prevention when setting the water levels. And as in that case, the failure to take this approach at most rises to the level of a negligence tort, not an intentional taking of downstream properties. Two, static liquefaction, not inadequate spillways, caused the failure, as the federal agency's independent forensic team found and as the plaintiffs have not contradicted. All perspectives considered, no federal taking occurred.

*State law*. "Private property," the Michigan Constitution says, "shall not be taken for public use without just compensation." Mich. Const. art. 10, § 2. This guarantee "offers broader protection than" the Fifth and Fourteenth Amendments do. *AFT Mich. v. Michigan*, 866 N.W.2d 782, 794 (Mich. 2015); *see Rafaeli, LLC v. Oakland County*, 952 N.W.2d 434, 462 (Mich. 2020) ("[O]ur holding speaks to Michigan's Takings Clause, which this Court has, on occasion, interpreted as offering broader protection to property owners."). To illustrate the point, the U.S. Supreme Court held that the government's use of eminent domain to transfer private property to private entities satisfies the Fifth Amendment's public-use requirement when that transfer serves a "public purpose." *Kelo v. City of New London*, 545 U.S. 469, 484 (2005). By contrast, the Michigan Supreme Court determined that economic development alone is not a public use justifying the condemnation of private property, even if such transfers involve a "public purpose." *County of Wayne v. Hathcock*, 684 N.W.2d 765, 784 (Mich. 2004); *see id.* at 786–87. In doing so, the Michigan Supreme Court overruled its decision in *Poletown Neighborhood Council v. City of Detroit*, 304 N.W.2d 455 (Mich. 1981), which in turn had relied on U.S. Supreme Court decisions in the area. *Id.* at 459 (citing *Berman v. Parker*, 348 U.S. 26, 32 (1954)); *see also AFT Mich.*, 866 N.W.2d at 794 & n.9 (recognizing the Michigan Supreme Court's rejection of the public use test in *Hathcock*).

Michigan permits its citizens to bring inverse condemnation claims—a cause of action available to property owners when a government action decreases their private property's value—to remedy a potential taking. *Proctor v. Saginaw Cnty. Bd. of Comm'rs*, 985 N.W.2d 193, 204 n.10 (Mich. Ct. App. 2022). To succeed, the plaintiff must show (1) that the government's conduct amounted to "a substantial cause" of the decrease in the value of the

property and (2) that "the government abused its powers in affirmative actions directly aimed at the property." *Blue Harvest, Inc. v. Dep't of Transp.*, 792 N.W.2d 798, 805 (Mich. Ct. App. 2010); *see Mays v. Governor of Michigan*, 954 N.W.2d 139, 148 (Mich. 2020).

The landowners do not meet the first imperative of this claim: causation. Static liquefaction, not spillovers, caused the dam's collapse. Poor construction in the 1920's produced soil fragility, which is atypical of most hydropower projects. Yes, the counties concede that the heavy rains became the straw that broke the camel's back. But, of course, the counties did not cause the heavy rains either. The two causes of the collapse—heavy rains and static liquefaction—had nothing to do with the counties' decision to seek permission from the state court to keep the lake levels where they had been for 90 plus years.

That's not all. The federal agency's independent forensic team also found that lowering the lake level would not necessarily have stopped the dam's eventual failure from static liquefaction. In the absence of causation connecting the counties' petition for water levels to the dam's collapse, no taking occurred under state law. *Cf. Peterman v. State Dep't of Nat. Res.*, 521 N.W.2d 499, 502–03, 509–10 (Mich. 1994).

*Krieger v. Department of Environment, Great Lakes, & Energy* does not lead to a different conclusion. *See* 2023 WL 5808605, at *10–14. Yes, it arose from a related lawsuit involving the Edenville Dam. And, yes, it held that affirmative actions "authoriz[ing] higher lake levels" could have "'set into motion the destructive forces' that caused the dam failure" and thus formed the basis of a cognizable claim. *Id.* at *10 (quoting *Peterman*, 521 N.W.2d at 507). But, no, it does not govern this case. All that *Krieger* decided was that another group sufficiently *pleaded* an inverse condemnation claim against the state agency with regulatory authority over the dam. *Id.* at *14. In that setting, the court had to accept as true the plaintiffs' factual allegations that the waters spilled over the top of the dam and that this spillage caused the dam's failure. *See id.* at *10. That is a distinction *with* a difference. Here, at the summary judgment stage, no material dispute remained after considerable discovery about the cause of the dam's collapse from static liquefaction, not poorly designed spillways.

We affirm.