# STATE OF MICHIGAN

# COURT OF APPEALS

LAWRENCE A. NAKFOOR and DEBRA L.
NAKFOOR,

        Plaintiffs-Appellees/Cross-
        Appellants,

v

OUR SAVIOR LUTHERAN CHURCH, C & D
HUGHES, and O'HARROW CONSTRUCTION
COMPANY,

        Defendants,

and

CHARTER TOWNSHIP OF DELTA,

        Defendant-Cross-Appellee,

and

EATON COUNTY DRAIN COMMISSIONER,

        Defendant-Appellant/Cross-
        Appellee.

UNPUBLISHED
January 30, 2018

No. 335257
Eaton Circuit Court
LC No. 15-001137-CZ

Before: MURPHY, P.J., and SAWYER and BECKERING, JJ.

PER CURIAM.

      Plaintiffs' real property has been flooded on several occasions in the last few years during heavy rains, which flooding plaintiffs attributed to an increase in the elevation of neighboring property during its development and construction and defects in an adjacent storm water drain system. Plaintiffs filed suit against the neighboring property owner, defendant Our Savior Lutheran Church (OSLC), a contractor that delivered and dumped the fill that increased the elevation of OSLC's land, defendant C & D Hughes, and a construction company involved in earth moving during OSLC's development of its property, defendant O'Harrow Construction Company. None of these defendants are part of this appeal. Plaintiffs also sued defendants

-1-

Eaton County Drain Commissioner (the Drain Commissioner) and Delta Charter Township (the Township), alleging negligence for failing to remedy defects in the storm drain or drain system, negligence in allowing the elevation change in OSLC's property, and inverse condemnation. The trial court denied the Drain Commissioner's motion for summary disposition that was based on the invocation of governmental immunity, with the court allowing plaintiffs' defect and negligence claims to go forward under the "sewage disposal system event" (SDSE) exception to governmental immunity, MCL 691.1416 *et seq.* The Drain Commissioner appeals that ruling as of right. The trial court granted summary disposition in favor of the Township on the basis of governmental immunity, concluding that the SDSE exception was inapplicable to the Township. That decision is not being challenged on appeal. Finally, the trial court granted summary disposition in favor of the Drain Commissioner and the Township on plaintiffs' claim of inverse condemnation. Plaintiffs cross appeal that ruling. We affirm the denial of the Drain Commissioner's motion for summary disposition, affirm the ruling summarily dismissing plaintiffs' inverse condemnation claim against the Township, and reverse the dismissal of the inverse condemnation claim brought against the Drain Commissioner.

## I. FACTS

Plaintiffs reside in the Countryside Estates subdivision in Grand Ledge, Michigan. In 1991, the Drain Commissioner constructed the "Myers & Henderson Drain District Project," which consisted of a 15-inch drainpipe, catch basins, and a berm that ran on a north-south line along the eastside of the subdivision. Plaintiffs' property abuts the west side of the drain system. The drain project resolved a flooding problem in the subdivision and was effective for over 17 years. Plaintiffs and other residents claimed that undeveloped property directly adjacent to the east side of the drain and berm was lowland and for years served as an unintentional "de facto retention pond," preventing flooding in the subdivision.

In 2008, OSLC began its construction of a church, a school, and ball fields on the previously undeveloped property to the east of the storm water drain system. In 2007, the Township had approved OSLC's site plan, which did not reflect any change in the property's elevation and referenced proposed storm drainage and grading plans to ensure that storm water would be contained on site and not trespass to the west where the subdivision is located. And the Drain Commissioner had granted OSLC a soil erosion and sedimentation control permit. Despite the fact that increasing the elevation of OSLC's land was not part of OSLC's approved site plan, C & D Hughes began openly delivering to and dumping on OSLC's property extensive amounts of spoil dirt excavated from storm water retention ponds that were part of a project known as the Section 17 Drain Project, which was located in another area of Eaton County. In answers to interrogatories provided by C & D Hughes, it was asserted that the Drain Commissioner had approved the excavation of the spoil dirt from the retention ponds "but had no role in the disposition of the dirt." According to C & D Hughes, it "receives no income from the disposition of spoil dirt" and numerous entities had requested receipt of the spoil dirt excavated from the Section 17 Drain Project, including OSLC. Interestingly, OSLC, in a response to requests for admissions, denied that it had agreed to or approved of the spoil dirt being dumped on its land. Regardless, the elevation of OSLC's property was ultimately raised four feet, approximately two feet higher than the berm. Plaintiffs allegedly warned the Drain Commissioner that this change in elevation would result in runoff onto their property. Nothing

was done by the Township or the Drain Commissioner to enjoin, challenge, or reverse the increase in the elevation of OSLC's property.

From 2009 through 2013, there were several instances of rainfall and spring snowmelt that caused water to overflow the berm and flood the subdivision. In June 2013, a "major rainfall" resulted in water flooding plaintiffs' property, with over five feet of standing water ending up in their basement, which rendered all of its contents unsalvageable. In April 2014, the Drain Commissioner approved the installation of two additional "catch basins" on the east side of the berm that flowed into the 15" drainpipe. However, in May 2014, water again overflowed the berm.

On June 14, 2015, a heavy rainfall caused flooding once again. Nine days later, another storm caused flooding so severe that emergency personnel were unable to reach plaintiffs' home, and plaintiffs' basement was again flooded. Around this time, on or about June 22, 2015, plaintiffs and several other subdivision property owners submitted a "Petition for Cleaning, Widening, Deepening, Straightening and Extending a County Drain" to the Drain Commissioner.

On February 24, 2016, plaintiffs filed their complaint against defendants and eventually filed a second amended complaint. Plaintiffs' complaint focused quite heavily on the 2007-2008 planning, oversight, processes, and review connected to the development of OSLC's property and the increase in the land's elevation. Further, we find especially pertinent here the following allegations in plaintiffs' complaint, which were set forth in the "claims" section of the complaint:

> 45.     Mr. Graham, Delta Township Planning Manager[,] was at the construction site and witnessed the dumping activity. Mr. Graham was also aware that the site plan showed no change in the site's elevation. . . . Mr. Graham's comments at this past June 15, Delta Township Board Meeting evidences the fact that he had reason to believe that the Eaton County Drain Commissioner . . . had "worked out an agreement" to bring the fill to the church site. The fact that Mr. Graham asks for a copy of a soil erosion and fill plan, doesn't absolve the Township of responsibility. The Township Zoning Ordinance states: "the clearing, grading and balancing of land may commence absent site plan review if all necessary permits have been obtained from the appropriate State and local agencies." Without evidence that the permits had in fact been obtained, the Township had ample reason to enforce compliance with the approved site plan, and stop the fill activity.

> 46.     Given Mr. Graham's above comments, combined with the fact that the Eaton County Drain Commissioner doesn't act to stop the dumping, there is reason to believe that . . . the Eaton County Drain Commissioner had in fact approved the several week fill activity. It is unfathomable to believe that a Drain Commissioner would approve any fill activity without requiring the need for a permit. But to allow thousands of truckloads of dirt to be hauled to a previous County Drain Project site are indefensible and negligent. The Defendant[s'] collective actions are directly responsible for the Plaintiffs ongoing flooding damages.

* * *

50.     Since May 15, 2014, the Defendants have been aware there is a defect causing the catch basins and drain pipe under the earthen berm to fail to drain. . . . The most recent flooding of the Plaintiffs['] property was the result of not only water coming from the church property overflowing the berm, it was exacerbated by the fact that the intersections' catch basins weren't draining.

* * *

53.     The Plaintiffs believe that for the past seven years, the Defendants have been negligent in failing to properly perform their duties. Not only did the Defendants fail to stop the fill activity in 2008, despite continued efforts by the Plaintiffs, the Defendants have subsequently failed to remedy the impact the fill dirt has had in causing debris and water to overflow the berm. The Defendants have also been negligent over these last two years in taking the necessary corrective action to ensure that the intersection catch basins will drain at all times. Allowing the  . . . [subdivision] to flood and become impassable not only represents an ongoing risk to the health and safety of the Plaintiffs, it's a similar risk to any motorist entering the intersection when it's flooded. The Plaintiffs flooding issues and losses are a direct result of the Defendants long term negligence.

The Drain Commissioner and the Township moved for summary disposition, and the trial court issued a detailed opinion and order.  The court found that plaintiffs' inverse condemnation claim failed as a matter of law because there was no *affirmative* action taken by the Township and Drain Commissioner that was *directly aimed* at plaintiffs' property.  It appears that the trial court made this ruling under MCR 2.116(C)(8) and (10).  The trial court also concluded that the Township was not an appropriate governmental agency for purposes of implicating the SDSE exception to governmental immunity, thereby entitling the Township to summary disposition under MCR 2.116(C)(7).  Finally, the court denied that portion of the Drain Commissioner's motion asserting governmental immunity, ruling that the SDSE exception to governmental immunity had been sufficiently pleaded and factually supported, and rejecting various arguments posed by the Drain Commissioner, which we shall explore below.

## II. ANALYSIS

### A.  STANDARD OF REVIEW AND SUMMARY DISPOSITION TESTS

We review de novo a trial court's ruling on a motion for summary disposition.  *Spiek v Dep't of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998).  The applicability of governmental immunity and the statutory exceptions to immunity is likewise reviewed de novo on appeal. *Snead v John Carlo, Inc*, 294 Mich App 343, 354; 813 NW2d 294 (2011).  Issues involving statutory interpretation are also reviewed de novo. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008).  Finally, constitutional questions are subject to de novo review. *Hinojosa v Dep't of Natural Resources*, 263 Mich App 537, 541; 688 NW2d 550 (2004).

-4-

MCR 2.116(C)(7) provides for summary disposition when a claim is barred because of "immunity granted by law." The movant may submit affidavits, depositions, admissions, or other documentary evidence in support of the motion if substantively admissible. *Odom v Wayne Co*, 482 Mich 459, 466; 760 NW2d 217 (2008). The complaint's contents must be accepted as true unless contradicted by the documentary evidence. *Id.* This Court must consider the documentary evidence in a light most favorable to the nonmoving party for purposes of MCR 2.116(C)(7). *RDM Holdings, Ltd v Continental Plastics Co*, 281 Mich App 678, 687; 762 NW2d 529 (2008). "If there is no factual dispute, whether a plaintiff's claim is barred under a principle set forth in MCR 2.116(C)(7) is a question of law for the court to decide." *Id.* When, however, a relevant factual dispute does exist, summary disposition is not appropriate. *Id.*

With respect to MCR 2.116(C)(8), which provides for summary disposition when a "party has failed to state a claim on which relief can be granted," it tests the legal sufficiency of a complaint. *Beaudrie v Henderson*, 465 Mich 124, 129; 631 NW2d 308 (2001). The trial court may only consider the pleadings in rendering its decision. *Id.* All factual allegations in the complaint are accepted as true. *Dolan v Continental Airlines/Continental Express*, 454 Mich 373, 380-381; 563 NW2d 23 (1997). "The motion should be granted if no factual development could possibly justify recovery." *Beaudrie*, 465 Mich at 130.

Finally, in regard to the well-established principles governing a motion for summary disposition brought pursuant to MCR 2.116(C)(10), this Court in *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013), explained:

> In general, MCR 2.116(C)(10) provides for summary disposition when there is no genuine issue regarding any material fact and the moving party is entitled to judgment or partial judgment as a matter of law. A motion brought under MCR 2.116(C)(10) tests the factual support for a party's claim. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). A court may only consider substantively admissible evidence actually proffered relative to a motion for summary disposition under MCR 2.116(C)(10). [Citations and quotation marks omitted.]

### B. GOVERNMENTAL IMMUNITY – GENERALLY

In *Moraccini v City of Sterling Hts*, 296 Mich App 387, 391-392; 822 NW2d 799 (2012), this Court set forth some basic controlling principles regarding governmental immunity:

> Except as otherwise provided, the governmental tort liability act (GTLA), MCL 691.1401 *et seq.*, broadly shields and grants to governmental agencies immunity from tort liability when an agency is engaged in the exercise or

discharge of a governmental function. MCL 691.1407(1); *Duffy v Dep't of Natural Resources*, 490 Mich 198, 204; 805 NW2d 399 (2011); *Grimes v Dep't of Transp*, 475 Mich 72, 76-77; 715 NW2d 275 (2006). "The existence and scope of governmental immunity was solely a creation of the courts until the Legislature enacted the GTLA in 1964, which codified several exceptions to governmental immunity that permit a plaintiff to pursue a claim against a governmental agency." *Duffy*, 490 Mich at 204. A governmental agency can be held liable under the GTLA only if a case falls into one of the enumerated statutory exceptions. *Grimes*, 475 Mich at 77; *Stanton v Battle Creek*, 466 Mich 611, 614-615; 647 NW2d 508 (2002). An activity that is expressly or impliedly authorized or mandated by constitution, statute, local charter, ordinance, or other law constitutes a governmental function. *Maskery v Univ of Mich Bd of Regents*, 468 Mich 609, 613-614; 664 NW2d 165 (2003). This Court gives the term "governmental function" a broad interpretation, but the statutory exceptions must be narrowly construed. *Id.* at 614. "A plaintiff filing suit against a governmental agency must initially plead his claims in avoidance of governmental immunity." *Odom*, 482 Mich at 478-479.

## C. SDSE EXCEPTION TO GOVERNMENTAL IMMUNITY

"A governmental agency is immune from tort liability for the overflow or backup of a sewage disposal system unless the overflow or backup is a sewage disposal system event and the governmental agency is an appropriate governmental agency." MCL 691.1417(2). A SDSE is defined as "the overflow or backup of a sewage disposal system onto real property." MCL 691.1416(k). And a "sewage disposal system" encompasses "storm sewers . . . and includes a storm water drain system under the jurisdiction and control of a governmental agency." MCL 691.1416(j). Accordingly, reading MCL 691.1416(k) and (j) together, and as relevant to this case, a SDSE involves the overflow or backup of a storm sewer or storm water drain system. MCL 691.1417(3) provides:

> If a claimant, including a claimant seeking noneconomic damages, believes that an event caused property damage or physical injury, the claimant may seek compensation for the property damage or physical injury from a governmental agency if the claimant shows that all of the following existed at the time of the event:
>
> (a) The governmental agency was an appropriate governmental agency.
>
> (b) The sewage disposal system had a defect.
>
> (c) The governmental agency knew, or in the exercise of reasonable diligence should have known, about the defect.
>
> (d) The governmental agency, having the legal authority to do so, failed to take reasonable steps in a reasonable amount of time to repair, correct, or remedy the defect.

(e) The defect was a substantial proximate cause of the event and the property damage or physical injury.

Relying on these criteria, this Court has held that in order for a claimant to avoid governmental immunity under the SDSE exception, the claimant must establish the elements found in MCL 691.1417(3)(a) through (e). *Cannon Twp v Rockford Pub Schs*, 311 Mich App 403, 415; 875 NW2d 242 (2015); *Linton v Arenac Co Rd Comm*, 273 Mich App 107, 113-114; 729 NW2d 883 (2006); *Willett v Waterford Charter Twp*, 271 Mich App 38, 49; 718 NW2d 386 (2006). A "defect" is statutorily defined as a "construction, design, maintenance, operation or repair defect." MCL 691.1416(e). Regarding this definition, the panel in *Willett*, 271 Mich App at 51, quoting *Random House Webster's College Dictionary* (1997), observed that "[g]iven that the definition of 'defect' itself uses the term 'defect,' and that the second use of the term is undefined in the statute, we reference dictionary definitions[,]" and a " 'defect' is defined as 'a fault or shortcoming; imperfection.' " (Citations omitted.) Accordingly, a "defect" in a storm sewer or storm water drain system encompasses a fault, shortcoming, or imperfection in the construction, design, maintenance, operation, or repair of the sewer or system.

## D. DISCUSSION – GOVERNMENTAL IMMUNITY ISSUE

We find it important to first identify the nature of the negligence claims actually being made by plaintiffs in their complaint. As reflected in paragraphs 50 and 53 of the complaint, plaintiffs alleged that the Drain Commissioner was negligent: (1) for failing to stop the fill activity in 2008 that heightened the elevation of OSLC's property; (2) for failing to remedy the impact the fill dirt had on causing debris and water to overflow the berm; and (3) for failing to take corrective actions with respect to catch basins and the drainpipe, which were not draining properly. We shall address each of these claims in turn.

In regard to the claim that the Drain Commissioner was negligent for failing to stop the fill activity that resulted in the increased elevation of OSLC's property, the assertion simply does not implicate the SDSE exception to governmental immunity, considering that it does not pertain to a failure to repair, correct, or remedy a fault, shortcoming, or imperfection, i.e., a defect, in the construction, design, maintenance, operation, or repair of the storm drain or storm water drain system. MCL 691.1417(3); MCL 691.1416(e); *Willett*, 271 Mich App at 51.

Next, concerning the claim that the Drain Commissioner was negligent for failing to remedy the impact the fill dirt had on causing debris and water to overflow the berm, we find that this allegation does implicate the SDSE exception to governmental immunity. With the development of OSLC's land and the increase in the elevation of the property, there was a change in the physical environment adjacent to the storm water drain system, resulting in storm waters that flowed into the system at a level that far exceeded the flow that occurred with pre-development rainfalls. And there was evidence sufficient to survive summary disposition indicating that with the change in the landscape's physical environment, the storm water drain system was inadequate to handle some rainfalls, causing flooding in the subdivision. Thus, there was evidence that the storm water drain system had a fault, shortcoming, or imperfection as to the *operation or maintenance* of the system following the increase in the elevation of OSLC's property. MCL 691.1417(3); MCL 691.1416(e); *Willett*, 271 Mich App at 51.

-7-

The situation is somewhat analogous to the facts in *Willett*, except that the outside force here – the elevation change – is more permanent in nature. In *Willett*, the plaintiff sued the defendant township because of a sewage backup caused by an obstruction in the sewer system created by a third party placing a large piece of concrete or asphalt into the system. 271 Mich App at 40-43. This Court recognized that the township had not created the obstruction and that "no reasonable maintenance program could have prevented the rogue act of a third party in creating the 'defect.' " *Id.* at 52. However, the *Willett* panel observed that the SDSE exception to governmental immunity did not require the responsible governmental authority to be at fault for creating or causing a defect. *Id.*

Just as the temporary obstruction in *Willett* caused a "defect" in the sewage disposal system, absent any fault by the township, with regard to the operation or maintenance of the system, there was evidence in the instant case that the neighboring elevation increase resulted in a defect in the storm water drain system with respect to the system's operation or maintenance, even if the Drain Commissioner played no role whatsoever in the elevation change.

Next, relative to plaintiffs' claim that the Drain Commissioner was negligent for failing to take corrective actions with respect to catch basins and the drainpipe, which were not draining properly, we conclude that the claim also implicates the SDSE exception to governmental immunity. Again, there was evidence sufficient to survive summary disposition showing the existence of a fault, shortcoming, or imperfection in the maintenance or operation of the storm water drain system, given the evidence that the drains failed to flow at times. MCL 691.1417(3); MCL 691.1416(e); *Willett*, 271 Mich App at 51. Because there existed adequate evidence to avoid summary dismissal based on governmental immunity for the reasons stated above, we find it unnecessary to address the question whether there was an issue of fact regarding whether the flooding resulted from a *design or construction* defect in the storm water drain system, assuming plaintiffs' complaint even alleged such a defect.

The Drain Commissioner argues that there was no evidence that the storm drain was actually defective, contending that the storm drain's capacity was designed to handle 10-year flood events and not "the unprecedented rain events of 2013 and 2015." There appears to be conflicting evidence concerning whether the heavy rains in 2013 and 2015 exceeded or failed to exceed the 10-year threshold and even regarding what exactly constitutes a 10-year storm. Regardless, as indicated, we decline to decide the "design" or "construction" issue. We will, however, voice a few comments on the matter. It is evident from the record that the flooding problems that developed in 2008 forward were not merely the result of rains, heavy or otherwise, but rather rains in conjunction with the increased elevation of OSLC's property; there were no flooding problems in the subdivision beforehand for approximately 17 years, during which there were certainly heavy rains at times. The Drain Commissioner conveniently ignores the increased-elevation component of this case in discussing whether a defect existed in the storm water drain system. While perhaps the storm drain, as originally designed and constructed, was adequate to prevent flooding in the subdivision before the change in elevation, although the previously undeveloped property flooded, the elevation increase clearly gave rise to a flooding problem. And the question that lies at the heart of this case is whether the storm water drain system had a defect with respect to its operation or maintenance, taking into consideration rainfalls and the change in the physical environment – the increase in the elevation of OSLC's property. On this question there exists a genuine issue of fact.

Further, there were adequate allegations and evidence that the Drain Commissioner knew, or in the exercise of reasonable diligence should have known, about the faults, shortcomings, and imperfections in the maintenance or operation of the storm water drain system; there was evidence that the repeated flooding of plaintiffs' property and the subdivision was brought to his attention from the very beginning and that he was aware of the elevation change and the associated concerns. MCL 691.1417(3)(c). Indeed, there was evidence that the Drain Commissioner was alerted about the prospect of flooding before it even first occurred.

Next, there was adequate evidence showing that the Drain Commissioner failed to take reasonable steps in a reasonable amount of time to repair, correct, or remedy the alleged defects in the operation or maintenance of the storm drain. MCL 691.1417(3)(d). The problematic flooding has been ongoing for years, and the installation of the two additional catch drains did not halt the flooding. The Drain Commissioner argues that he lacked the necessary legal authority to repair, correct, or remedy the alleged defects. *Id.* However, MCL 280.196(4) provides:

> If an inspection discloses the necessity of expending money for the *maintenance and repair of a drain in order to keep it in working order*, the drain commissioner for a county drain, or the drainage board for an intercounty drain, may *without petition* expend an amount not to exceed in any 1 year $5,000.00 per mile or fraction of a mile for maintenance and repair of a drain, exclusive of inspection and engineering fees and the cost of publication and mailing. The determination of the maximum expenditure allowed without a petition or resolution shall be based on the total number of miles of the drain and not on the actual number of miles or location of the maintenance or repair. [Emphasis added.]

Accordingly, the Drain Commissioner had the authority, absent any petition, to expend monies on the maintenance and repair of the storm water drain system in order to keep it in working order, so long as he stayed within the monetary limits of the statute. Indeed, the Drain Commissioner previously acted without a petition in 2014 when he authorized the addition of the two catch basins. As part of discovery, the Drain Commissioner admitted: "Two flared end sections/intakes were added into the 15" drain on the Myers and Henderson drain district . . . *This was considered a maintenance issue, and therefore, did not require a petition.*" (Emphasis added.) Given the nature of plaintiffs' claims as characterized and discussed earlier, the remedy could have potentially entailed cost-acceptable maintenance and repair efforts directed in a manner to address and respond to the impact of additional storm waters handled by the storm drain as caused by the change in the elevation of OSLC's property, i.e., to bring the storm drain into working order under the changed environmental circumstances. Ultimately, the trier of fact will need to assess, under the evidence presented and the parameters set by MCL 280.196(4), whether the statute provided the Drain Commissioner with the legal authority to effectively repair, correct, or remedy the alleged operational and maintenance defects.

E. INVERSE CONDEMNATION

Inverse condemnation concerns the taking of private property absent the commencement of condemnation proceedings, and pursuant to Const 1963, art 10, § 2, and US Const, Am V, "a

victim of such a taking is entitled to just compensation for the value of the property taken." *Hart v Detroit*, 416 Mich 488, 494; 331 NW2d 438 (1982). In *Hinojosa*, 263 Mich App at 548, this Court observed:

> What governmental action constitutes a "taking" is not narrowly construed, nor does it require an actual physical invasion of the property. No precise formula exists. Pertinent factors include whether the governmental entity abused its exercise of legitimate eminent domain power to plaintiff's detriment. Further, a plaintiff alleging inverse condemnation must prove a causal connection between the government's action and the alleged damages. A plaintiff alleging a de facto taking or inverse condemnation must prove that the government's actions were a *substantial* cause of the decline of his property's value and also establish the government abused its legitimate powers in affirmative actions directly aimed at the plaintiff's property. While there is no exact formula to establish a de facto taking, there must be some action by the government specifically directed toward the plaintiff's property that has the effect of limiting the use of the property. [Citations, ellipsis, and quotation marks omitted.]

Inaction or omissions cannot support a claim of inverse condemnation. *Id.* at 549.

A taking can occur when there is a diminution of property value caused by the government. *Merkur Steel Supply, Inc v Detroit*, 261 Mich App 116, 130; 680 NW2d 485 (2004). "It is well settled that a governmental actor may cause a taking of private property by flooding the property or diverting excess surface water onto the property." *Wiggins v City of Burton*, 291 Mich App 532, 572; 805 NW2d 517 (2011). Despite plaintiffs' protestation to the contrary, *all* inverse condemnation claims require proof of *affirmative actions* by the government that are aimed at a plaintiff's property. *Long v Liquor Control Comm*, __ Mich App __, __; __ NW2d __ (2017); slip op at 2; *Wiggins*, 291 Mich App at 571; *Blue Harvest, Inc v Dep't of Transp*, 288 Mich App 267, 277; 792 NW2d 798 (2010); *Marilyn Froling Revocable Living Trust v Bloomfield Hills Country Club*, 283 Mich App 264, 295; 769 NW2d 234 (2009); *Hinojosa*, 263 Mich App at 548; *Merkur*, 261 Mich App at 130.

Review of plaintiffs' complaint does not reveal any allegations of affirmative actions taken by the Township with respect to the elevation change of OSLC's property; just alleged omissions and failures to act. Accordingly, the trial court properly granted summary disposition in favor of the Township on plaintiffs' claim of inverse condemnation. However, the same cannot be said with respect to the Drain Commissioner. As gleaned from paragraphs 45 and 46 of the complaint, plaintiffs essentially alleged that there was evidence showing, as well as surrounding circumstances from which it could be inferred, that the Drain Commissioner had agreed to or approved the fill activity that increased the elevation, which would constitute an affirmative act. Although there was evidence that the Drain Commissioner did not approve or authorize the fill activity, there was also evidence to the contrary. In Township Board Meeting Minutes from June 15, 2015, it was stated:

> Mr. Graham stated a site plan was approved in 2008 for [OSLC]. Shortly thereafter, there was a Section 17 drain project done on St. Joe Highway by Brady Harrington, the Drain Commissioner. Mr. Harrington needed a place to dispose of

waste, he worked out an agreement with CD Hughes to haul all of the spoil dirt on to the westernmost portion of the church property.

The trial court indicated that even assuming that there was evidence of an affirmative act, there was no evidence indicating that any act was aimed at plaintiffs' property. We find that the trial court construed the term "aimed" too narrowly. In *Peterman v Dep't of Natural Resources*, 446 Mich 177, 191; 521 NW2d 499 (1994), our Supreme Court ruled:

> In the instant case, the trial court found that defendant's actions were the proximate cause of the destruction of plaintiffs' beachfront property. Assuming that defendant did not directly invade plaintiffs' land, it undoubtedly set into motion the destructive forces that caused the erosion and eventual destruction of the property. Defendant was forewarned that the construction of the jetties could very well result in the washing away of plaintiffs' property, and the evidence reveals that the destruction of plaintiffs' property was the natural and direct result of the defendant's construction of the boat launch. The effect of defendant's actions were no less destructive than bulldozing the property into the bay. . . . Defendant, therefore, may not hide behind the shield of causation in the instant case.

Here, the Drain Commissioner did not directly invade plaintiffs' land, but there was evidence that he set into motion the forces that ultimately caused flooding, i.e., authorizing or approving the fill activity that resulted in the increase in the elevation of OSLC's property, which had the effect of diverting excess storm water onto plaintiffs' property.

Affirmed with regard to the denial of the Drain Commissioner's motion for summary disposition premised on governmental immunity, affirmed with respect to the summary dismissal of plaintiffs' claim of inverse condemnation against the Township, and reversed and remanded relative to the ruling granting summary disposition to the Drain Commissioner on plaintiffs' claim of inverse condemnation. We do not retain jurisdiction. Plaintiffs are awarded taxable costs under MCR 7.219 as to the Drain Commissioner, and the Township is awarded taxable costs under MCR 7.219 as to plaintiffs.

/s/ William B. Murphy
/s/ David H. Sawyer
/s/ Jane M. Beckering