*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JEFFREY L. ALEXANDER,

        Plaintiff/Counterdefendant-Appellant,

v

LYNDA J. LANE,

        Defendant/Counterplaintiff/Cross
        Defendant-Appellee,

and

SPIERLING TRUCKING & EXCAVATING, INC.,

        Defendant/Cross Plaintiff-Appellee.

UNPUBLISHED
May 26, 2022

No. 356636
Emmet Circuit Court
LC No. 19-106680-CH

Before: GLEICHER, C.J., and RONAYNE KRAUSE and BOONSTRA, JJ.

PER CURIAM.

In this dispute involving an alleged intrusion of water onto plaintiff's lakefront property after defendants performed excavating and filling work on a neighboring parcel, plaintiff appeals the trial court's order granting defendants summary disposition of plaintiff's nuisance, trespass, and easement claims. We affirm.

## I. PERTINENT FACTS

Plaintiff owns real property on Lake Michigan, commonly known as 912 Lakeside Drive, in Mackinaw City. Defendant Lane is the current owner of an adjacent parcel to the west, commonly known as 914 Lakeside Drive. Both parcels, and the houses on the parcels, were originally part of family property owned by the Ethelyn Alexander Trust, of which plaintiff, along with his siblings, were beneficiaries (the family property). The sisters were the trustees. In January 2014, the trustees conveyed the 912 Lakeside parcel to plaintiff, who had resided there since 1989.

In April 2018, the trustees sold the 914 Lakeside parcel to defendant Lane. Both parcels contained naturally occurring artesian springs.[1]

According to plaintiff, there had not been a wetland area on the family property close to the beach for years. He further maintained that, decades earlier, his father installed an inter-connected water drainage system on what would later become the Lane parcel. The system consisted of a cistern, two artesian spring casings, and a boat well with a pipe. Since that time, the drainage system was used to divert and drain the artesian spring water from the family property into Lake Michigan, thereby benefiting plaintiff's parcel. Plaintiff testified that his father had installed these structures to direct the flow of water where he wanted it to go, but he admitted that he did not fully understand how the system operated. Further, plaintiff could not speak to the extent to which, if any, his father had altered the natural course of the water flow. Plaintiff maintained that, at the time Lane acquired her property, these historic structures existed and were visible. The cistern straddled the boundary between plaintiff's and Lane's parcels, and the boat well was entirely on Lane's parcel. Plaintiff contended that at the time Lane acquired her parcel, a drainage pipe still connected the boat well to Lake Michigan, but it is not disputed that the boat well was otherwise dilapidated, potentially hazardous, and no longer usable as a boat well.

Lane testified that she was unaware of any artesian springs on her property and saw no evidence of any such springs, she saw no wetlands or standing water on her property, and she described her property as "high and dry" every time she visited. She had no knowledge of how water drained to Lake Michigan from the properties; she was only aware that the previous owners had installed a sump pump in her basement. She testified that she believed the boat well was a dangerous hazard and that, at the time of the sale, she was informed that she could fill it. Neither the realtor nor the trustees disclosed any issues with the property or wetlands on the property. Conversely, she described plaintiff's property as "just always . . . very wet."[2]

Lane hired defendant Spierling Trucking & Excavating to clean up her property and remove the conditions she thought hazardous, including filling the boat well and removing the "dilapidated deck" over it, as well as removing "cement with rerod sticking out of it" from her beach. According to owner Ernest Spierling, at Lane's direction, they removed the broken

---

[1] Plaintiff's expert explained that a spring with an artesian condition is a spring situated such that pressure pushes the water flow upward.

[2] Plaintiff testified to water issues on his property even before the sale of the 914 parcel to Lane, including flooding from clogged drains in a driveway and wet areas that appeared after his sisters "started pumping water out of the basement" to the surface on the Lane parcel in 2016 to ready it for sale. Plaintiff explained that, after his sisters' activities, a "wetland" appeared on his property with a "mild amount of water," in response to which he placed four-inch pallets to keep him out of the water. According to plaintiff, after learning that his sisters planned to sell the Lane parcel, he informed them of his desire to resolve the water issues, but to no avail, prompting him to place a sign on his property warning that unresolved "encroachment issues" existed between the parcels. Although Lane acknowledged seeing that sign, she stated that she assumed it referred to a garage-encroachment issue involving a neighboring parcel. The sign did not specify the nature of the "encroachment issues," and it bore no contact information for plaintiff.

concrete pieces near Lane's shoreline, filled the boat well with the concrete debris and fill dirt, demolished the dilapidated deck over the boat well, extended the sump-pump pipe from her backyard to the lake, removed a few dead trees, and covered the tracks from his machinery with topsoil. Spierling stated that it was not evident to him that there was a "still-existing purpose or use" for the boat well, or that the boat well "could be part of a water drainage system benefiting plaintiff." Spierling did not see any pipes under or above ground, and only the boat well was filled in. He further testified that he did not observe any open areas of water, or where water might enter the ground, on Lane's property, which he described as "mowable" with grass. On the other hand, Spierling observed "pooling water," standing water, or wetlands on plaintiff's property between the shore and the house with a row of pallets to access the beach. Neither Lane nor Spierling discussed their work with plaintiff.

Plaintiff asserted that defendants' excavating and filling activities included burying the boat well, artesian springs, and the cistern that was partially on his own property. As a result, the water from the artesian springs no longer drained from the properties into Lake Michigan as it historically had, but instead flowed and vented onto his property. He explained that the pond in his front yard had gone from "a little standing water to 10 to 12 inches of standing water," such that he now needed two sets of four-inch pallets to remain out of the water. Plaintiff did not attribute the increased water levels on his property to Lake Michigan's rising water levels.

On August 14, 2019, the Department of Environment, Great Lakes, and Energy (EGLE) inspected Lane's property for compliance with the Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq*., and a year later issued Lane a notice of violation for failing to obtain the required wetland permits for the filling activity, and it issued an order to restore. Apparently, Lane ultimately resolved the issue with EGLE by agreeing to remove some of the topsoil, but she was not required to reopen the boat well or replace the concrete removed from the shoreline.

On September 18, 2019, plaintiff initiated this lawsuit, asserting claims of trespass, nuisance, and easement by necessity or implied from a quasi-easement. The gravamen of the complaint was that the filling work on Lane's property wrongfully diverted water from the artesian springs, causing water to intrude onto his property. He claimed that the destruction of the drainage system resulted in the spring water "now hav[ing] no other exit to Lake Michigan than by leaching through the aquifer of beach gravel across plaintiff's parcel, which is now covered with 8-10 inches of 45-degree spring water." Plaintiff sought damages, plus an order requiring defendants to restore his water-drainage system to full capacity and operation, and permanently enjoining defendants from taking any action that would divert water onto his property. Plaintiff further sought an order declaring that his use of the water-drainage system on Lane's parcel was a valid and lawful easement benefiting plaintiff's parcel for the purpose of directing water to the lake, and permanently enjoining defendants from interfering with plaintiff's use of the system.

Plaintiff and Lane each retained experts, but neither could conclude with certainty whether defendants' filling activity caused plaintiff's water accumulations. Plaintiff's expert, Andrew Smits, opined that the filling of the boat well had affected the hydrology in the area, and explained that "the closest place" the water could vent, i.e., the shortest distance with the likely least resistance, was the spring and wetland on plaintiff's property. Smits opined that the artesian condition, hydrogeology, and nature of the bedrock in the area promoted that flow. However, Smits conceded

that the rising water levels in Lake Michigan and the artesian springs on plaintiff's own property could also be potential sources for the water accumulation. Because no proper hydrogeological investigation had been performed, he could not be certain how much water was being diverted to plaintiff's parcel as a result of defendants' filling activity, or where the water was otherwise going. Smits did not offer an opinion whether removing the dirt from the boat well would benefit plaintiff's property, and he stated that he did not have enough information to determine whether eliminating the manmade structures would have returned the water flow to its natural course. Nevertheless, he opined from his expertise and observations that the filling activity must have resulted in the diversion of some water from Lane's parcel to plaintiff's parcel.

Lane's expert, Roger Mawby, assumed that the standing water was originating from the "several springs" or "vents" on the properties, but he indicated that it was possible "during high-water events in Lake Michigan that you could have wave wash over at that high point and it could replenish that area." Mawby explained that water travels to Lake Michigan "through the soils that are built from a point of higher water elevation to lower elevation." He believed that both parcels, which had a higher groundwater gradient[3] than Lake Michigan, would ultimately vent into Lake Michigan, and that the standing water could get to the lake through drains or by venting through the soil, meaning the water would "slowly seep through the existing soils and then back to Lake Michigan." He explained that eventually all of the water would go into the lake, and that "[i]t's just a question of how quickly it gets there and the difference between how quickly it vents versus how quickly its recharged." He further explained that the standing water could result from water "being held up by probably some form of geology that allows it to vent slowly versus permeable." Mawby could not determine what percentage of the groundwater from Lane's property went to plaintiff's property or what direction the water might flow, beyond stating that there was a "bigger groundwater gradient in the direction of Lake Michigan," and that, absent an anomaly, the groundwater in the region generally flows to Lake Michigan. Mawby offered no conclusion whether the water issue on plaintiff's property was directly caused by filling the boat well, but, seemingly due to microphone problems during his deposition, his explanation was largely incomprehensible. He noted that the exceptionally high water level in Lake Michigan "certainly complicates this," and he seemingly opined that the higher lake levels were the "more probable" cause of plaintiff's increased standing water.

Following discovery, the parties filed cross-motions for summary disposition. After a hearing on the parties' motions, the trial court dismissed plaintiff's nuisance claims under MCR 2.116(C)(8) and his trespass and easement claims under MCR 2.116(C)(10). This appeal ensued.[4]

---

[3] Mawby explained that a groundwater gradient is the "difference in height of groundwater over a distance." He described groundwater as "a slow-moving river below the ground surface that typically moves towards the surface water body and then vents into that water body."

[4] Numerous other matters were litigated below, including an easement claim regarding Lane's driveway and a prescriptive easement claim regarding the water drainage system, but are not at issue in this appeal.

## II. STANDARD OF REVIEW

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, this Court considers all evidence submitted by the parties in the light most favorable to the non-moving party and grants summary disposition only where the evidence fails to establish a genuine issue regarding any material fact. *Id*. at 120. A motion brought under MCR 2.116(C)(8) should be granted only where the complaint is so legally deficient that recovery would be impossible even if all well-pleaded facts were true and construed in the light most favorable to the non-moving party. *Id*. at 119. Only the pleadings may be considered when deciding a motion under MCR 2.116(C)(8). *Id*. at 119-120. The interpretation and application of statutes, rules, and legal doctrines is also reviewed de novo. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008).

## III. NUISANCE

Plaintiff argues that the trial court erred in granting summary disposition of his nuisance claims under MCR 2.116(C)(8). We disagree.

## A. NUISANCE IN FACT

We agree with the trial court that plaintiff's claim of nuisance in fact, based on the alleged physical intrusion of water onto his land, sounded in trespass rather than in nuisance.

"[P]ossessory rights to real property include as distinct interests the right to exclude and the right to enjoy, violations of which give rise to the distinct causes of action respectively of trespass and nuisance." *Adams v Cleveland-Cliffs Iron Co*, 237 Mich App 51, 58-59; 602 NW2d 215 (1999). "A private nuisance is a *nontrespassory* invasion of another's interest in the private use and enjoyment of land." *Adkins v Thomas Solvent Co*, 440 Mich 293, 302; 487 NW2d 715 (1992) (emphasis added). In Michigan, the distinction between trespass and nuisance is important: a trespass involves a physical intrusion of a tangible object onto the land of another without regard to whether any harm ensues, whereas a nuisance involves some kind of contamination of the environment over the land of another that interferes with that other's use of the property and causes significant harm. See *Wiggins v City of Burton*, 291 Mich App 532, 554-556; 805 NW2d 517 (2011). Thus, an intrusion of water flow onto a plaintiff's property is not actionable in nuisance:

> It is beyond dispute that a defendant's unauthorized act of causing excess waters to flow onto another person's property constitutes a trespass. This is because the unauthorized flooding of another person's land constitutes an unauthorized direct or immediate intrusion of a physical, tangible object onto land over which the plaintiff has a right of exclusive possession. . . . [O]nce such an unauthorized intrusion is proved, the tort of trespass has been established, and the plaintiff is presumptively entitled to at least nominal damages. For these same reasons, the flow of excess waters onto the [plaintiffs'] parcel will not be actionable in nuisance because water is a physical, tangible object. [*Id*. at 566-567 (quotation marks and citations omitted).]

The gravamen of plaintiff's complaint is that defendants' conduct caused water to intrude onto his property and stay there. The trial court therefore properly concluded that plaintiff was, in substance, alleging a trespass rather than a nuisance,[5] and it properly dismissed plaintiff's nuisance claim as a consequence.[6]

## B. NUISANCE PER SE

Plaintiff also argues that defendants' excavating and filling activities undertaken without legally required permits violated various environmental regulations, including the NREPA, and thereby constituted a nuisance per se. We disagree.

"The distinction between a nuisance per se and a nuisance in fact is an evidentiary one. A nuisance per se is an act, occupation or structure which is a nuisance at all times and under all circumstances. Once the act has been proved, the court decides as a matter of law whether the act complained of constitutes a nuisance per se." *Ford v Detroit*, 91 Mich App 333, 335; 283 NW2d 739 (1979). Violation of a zoning ordinance can constitute a nuisance per se. See *Soupal v Shady View, Inc*, 469 Mich 458, 464-465; 672 NW2d 171 (2003); *High v Cascade Hills Country Club*, 173 Mich App 622, 629; 434 NW2d 199 (1988); see also MCL 125.3407 ("Except as otherwise provided by law, a use of land . . . or structure, . . . in violation of a zoning ordinance or regulation adopted under [the Zoning Enabling Act[7]] is a nuisance per se."). Indeed, the Legislature provided an action for nuisance per se "to give teeth to local zoning enactments." *Fredal v Forster*, 9 Mich App 215, 229; 156 NW2d 606 (1967).

---

[5] Plaintiff argues that our Supreme Court recognized a cause of action under the doctrine of "trespassory nuisance" in *Hadfield v Oakland Co Drain Comm'r*, 430 Mich 139; 422 NW2d 205 (1988). In *Hadfield*, our Supreme Court recognized that "trespass-nuisance" was a limited exception to governmental immunity, defined as "a direct trespass on, or the interference with the use and enjoyment of, land that results from a physical intrusion caused by, or under the control of, a government entity." *Id.* at 145 (BRICKLEY, J). Our Supreme Court further explained that "[t]he elements may be summarized as: condition (*nuisance or trespass*); cause (physical intrusion); and causation or control (by government)." *Id*. at 169 (emphasis added). It is therefore not a cause of action applicable to private individuals, or seemingly even a true cause of action at all. Additionally, the trespass-nuisance exception has been held more recently not to have survived enactment of the governmental tort liability act. *Pohutski v Allen Park*, 465 Mich 675, 679, 686-690; 641 NW2d 219 (2002); *Blue Harvest, Inc v Dep't of Transp*, 288 Mich App 267, 274; 792 NW2d 798 (2010).

[6] Defendants alternatively argue that plaintiff's nuisance claim was properly dismissed because he failed to establish that defendants' filling activities proximately caused the water intrusion onto his property. We decline to consider this argument because doing so is unnecessary; however, as we discuss below in the context of plaintiff's trespass claim, we are not persuaded we would agree with defendants.

[7] MCL 125.3101 *et seq.*

Plaintiff argues that this case is similar to cases where the use of one's land in violation of a zoning ordinance constituted a nuisance per se. However, we are unaware of any statutory or case law—and none has been cited—establishing that violations of environmental regulations should also constitute nuisances per se. In fact, plaintiff's attorney admitted below that he was unable to find any environmental statute that "would codify that kind of nuisance" in the manner that MCL 125.3407 does for violations of zoning ordinances or regulations. We believe that any expansion of the scope of what constitutes a nuisance per se should come from the Legislature. The trial court therefore properly dismissed plaintiff's nuisance claim on the basis of "the absence of any statutory provision which would make the violation of the environmental laws allegedly violated by the Defendants a nuisance."[8]

## IV. IMPLIED EASEMENT

Plaintiff next argues that the trial court erred in granting summary disposition of his claim based on an implied easement related to his continued use of a water-drainage system that has for decades been in place on Lane's parcel and benefited him. We disagree.

"An easement is the right to use the land of another for a specified purpose." *Schadewald v Brule*, 225 Mich App 26, 35; 570 NW2d 788 (1997). An implied easement may arise by necessity or by implication from a quasi-easement. *Charles A Murray Trust v Futrell*, 303 Mich App 28, 41; 840 NW2d 775 (2013). "The party asserting the easement has the burden of proving the claim by a preponderance of the evidence." *Schmidt v Eger*, 94 Mich App 728, 731; 289 NW2d 851 (1980).

## A. EASEMENT BY NECESSITY

Plaintiff's argument in support of an easement by necessity urges us to expand the doctrine far beyond its historically established scope. An easement by necessity arises when a single parcel of property is split, one of the ensuing parcels is landlocked as a result, and the landlocked parcel is essentially impossible to access unless a right-of-way is implied over the other parcel or parcels. *Murray Trust*, 303 Mich App at 41-42. An easement by necessity requires strict necessity, not merely reasonable necessity. *Id.* at 45-50. "Mere convenience, or even reasonable necessity, will not be sufficient if there are alternative routes, even if these alternatives prove more difficult or more expensive." *Schmidt*, 94 Mich App at 732. See also *Murray Trust,* 303 Mich App at 55. In other words, an easement by necessity is a remedy to a very narrow class of situations where the owner of a landlocked parcel *cannot access* that parcel.

Although the proceedings below did involve an issue of whether plaintiff could avail himself of Lane's driveway, that issue is not before us on appeal. Otherwise, there is simply no allegation that plaintiff *cannot access* his property. Even if we were to accept as true plaintiff's

---

[8] We therefore decline to consider defendants' arguments in support of an alternative basis for affirming.

allegation that restoration of the drainage system is the only way[9] to divert water from his property into Lake Michigan, that allegation still would not affect his ability to *access* his property. At most, plaintiff challenges the extent to which he can *use* his property. The trial court stated that "the recognition of an easement by necessity for this water claim isn't supported," and that "there is no claim of a landlocked parcel that would support an easement by necessity." We agree with the trial court.

## B. EASEMENT IMPLIED FROM A QUASI-EASEMENT

Plaintiff also argues that there was at least a genuine question of fact whether the alleged water drainage servitude should constitute an easement implied from a quasi-easement. Although plaintiff has established some of the requisite elements of such a claim, we again disagree.

A "quasi-easement" arises when a person who owns two adjacent parcels of land imposes a servitude on one parcel for the benefit of the other parcel. *Schmidt*, 94 Mich App at 736-737. Doing so does not create a true easement, because "it is legally impossible to have an 'easement' in your own land." *Id*. at 736. However, when one of the two parcels is conveyed to a different person, the quasi-easement "may ripen into a full easement." *Id*. at 736-737. In addition, to establish an easement implied from a quasi-easement, the servitude must be "apparently permanent and obvious," continuously used during the unity of title, and "reasonably necessary for the fair enjoyment of" plaintiff's property. *Murray Trust*, 303 Mich App at 42; *Rannels v Marx*, 357 Mich 453, 456; 98 NW2d 583 (1959).

Here, plaintiff's parcel and Lane's parcel were formerly owned by a common owner. There is at least a question of fact whether that common owner's construction of the drainage system imposed a servitude upon Lane's parcel for the benefit of plaintiff's parcel prior to any conveyance of either parcel. Furthermore, the drainage system, once installed, would have continued operating indefinitely, establishing the requisite continuousness. See *Zemon v Netzorg*, 247 Mich 563, 565; 226 NW 242 (1929) (a continuous easement is one "used continually without the intervention of man," e.g., "a drain or sewer," whereas a discontinuous easement is "one the use of which can only be had by the interference of man."). Plaintiff has also established a question of fact whether the operation of the drainage system, and thus the servitude, is reasonably necessary to keep water from pooling on plaintiff's property, and therefore is reasonably necessary to his fair enjoyment of his property.

However, we agree with the trial court that the evidence, viewed in the light most favorable to plaintiff, cannot satisfy the final requirement for a quasi-easement to ripen into a full easement: that the servitude must be "apparently permanent and obvious." There was ample evidence that the surface features of the drainage system—specifically, the boat well, the cistern, and possibly some piping—were apparently permanent and obvious. Nevertheless, the servitude itself must be apparently permanent and obvious, not merely the existence of some of the structural components. It would not have been apparent that those structures still served any functional purpose, let alone

---

[9] The evidence suggests that other means of drainage might exist: plaintiff's expert testified that he had prepared a proposal for "restoring land contours and land areas such that less of the property is inundated with water and the ponds are returned to their more historic expression."

functioned as components of a complex, interconnected system for the purpose of diverting artesian spring water from plaintiff's property into Lake Michigan.

Although plaintiff testified that multiple pipes were coming in and out of the cistern, it is not apparent that the pipe system was visible, or that it was otherwise apparent how the system worked. Plaintiff testified that he "was never really sure which one was draining in and which one was draining out," that he was still trying to understand how the system operated, and that he assumed that there was some "kind of drain" to the cistern on his property only because his property was dry until defendants' actions buried the structures.

It had been decades since the boat well was used for its original and obvious purpose of boat storage and access to Lake Michigan, and its undisputedly dilapidated state would have strongly suggested that the boat well no longer had any purpose. The lake had built up a berm blocking its entry, the well had not been connected to the lake since at least 1989, part of the well was covered up, and the part remaining in view was "a foot or two-feet deep and clogged with watercress." Spierling stated that it was not evident when he worked on Lane's property in 2019 "that there was a still-existing purpose or use" for the boat well, or that the well "could be part of a water drainage system benefiting" plaintiff's property. He referred to the boat well as a dangerous several-foot-deep "hole" with water in it, or a "pit," with "a dilapidated, rotten deck" over it. Lane reasonably perceived the well as a neglected structure and a hazard on her property; she testified that "they" informed her at the time she purchased her parcel in 2018 that she could fill it, and that she had "no prior knowledge of how water was draining" from the parcels.[10]

There was evidence of a pipe protruding from the ridge by the lake, which, according to plaintiff, drained the spring water from the boat well to the lake. A pipe would naturally imply some kind of drainage. However, the mere existence of the pipe would not necessarily imply that it had anything to do with plaintiff's parcel, and there was no evidence that the pipe was a component of an interconnected drainage system involving the boat well and the cistern. Similarly, a prominent sign proclaiming the existence of unspecified "encroachment issues" would not have alerted any observer to the existence of the drainage system or an associated servitude. In fact, Lane testified that she believed that the sign referred to a garage's physical encroachment on another parcel. Even plaintiff testified that he did not fully understand how his father's cistern system worked, including how the water naturally flowed or the extent to which his father had altered the natural flow.

Viewing the evidence in the light most favorable to plaintiff, we hold that the trial court did not err in concluding that plaintiff failed to establish that there was an "apparently permanent and obvious" water drainage servitude for the benefit of his parcel. Even if, historically, the structures on the Lane property were independently visible, there was no evidence from which it could be reasonably inferred that it was obvious or readily apparent that those structures were part of a working and interconnected water drainage and diversion system intended to permanently

---

[10] The pertinent date for establishing the apparentness of an easement is the date of severance of unified title. *Schmidt*, 94 Mich App at 736. The pertinent date here would therefore be 2014, when the 912 parcel was conveyed to plaintiff. However, there is no indication that anything about the drainage system structures or the uses of the properties changed from 2014 to 2019.

benefit plaintiff's parcel at the time of the severance of the family property. That is, the evidence did not show that plaintiff's parcel was "visibly dependent" upon the Lane parcel for water drainage. See *Rannels*, 357 Mich at 585.

Because plaintiff failed to establish a genuine factual issue regarding whether the alleged drainage servitude was apparently permanent and obvious, the trial court properly dismissed the claim for an easement implied from a quasi-easement in the continued use of the alleged system.

## V. TRESPASS

Plaintiff argues that the trial court erred in granting summary disposition of his trespass claim pursuant to MCR 2.116(C)(10). We disagree.

> Recovery for trespass to land in Michigan is available only upon proof of an unauthorized direct or immediate intrusion of a physical, tangible object onto land over which the plaintiff has a right of exclusive possession. A 'direct or immediate' invasion for purposes of trespass is one that is accomplished by any means that the offender knew or reasonably should have known would result in the physical invasion of the plaintiff's land. Damages may be recovered for any *appreciable* intrusion. [*Boylan v Fifty-Eight LLC*, 289 Mich App 709, 723; 808 NW2d 277 (2010) (quotation marks, citations, and alteration omitted; emphasis in original).]

"It is a well-established principle of law that all persons who instigate, command, encourage, advise, ratify, or condone the commission of a trespass are cotrespassers and are jointly and severally liable as joint tortfeasors." *Wiggins*, 291 Mich App at 557 (quotation marks and citation omitted). As discussed, "water is a physical, tangible object," *id*. at 567, and thus an "unauthorized act of causing excess waters to flow onto another person's property constitutes a trespass," *id*. at 566. Further, "[s]urface-water diversion may effect an intrusion onto land." *Boylan*, 289 Mich App at 723.

Plaintiff's expert's testimony, viewed in the light most favorable to plaintiff, sufficiently linked defendants' filling activity to the increased presence of spring water on plaintiff's property. Although there may have been other possible contributing factors, there was evidence describing what the drainage system accomplished, evidence of a drastic increase in standing water on plaintiff's property shortly after the system's destruction, and expert testimony explaining how and why the system's destruction would have caused that increase in standing water. Taken together, the evidence establishes more than mere conjecture or possibility; rather, it establishes a reasonable probability that defendants' conduct "more likely than not" caused the flooding. See *Skinner v Square D Co*, 445 Mich 153, 163-170; 516 NW2d 475 (1994). The trial court erred in finding that plaintiff failed to establish a question of fact regarding causation; i.e., whether defendants' activity caused spring water to divert onto plaintiff's property.

However, a claim for trespass also has a scienter element. Plaintiff is correct to point out that an actor's lack of intent to cause harm is irrelevant to whether the actor committed a trespass. See *Allison v Chandler*, 11 Mich 542, 561 (1863); *Boylan*, 289 Mich App at 726. Defendants are therefore not absolved of trespass merely because they did not intend to damage plaintiff's

property. However, the intrusion itself must be knowing and intentional. *Kelly v Fine*, 354 Mich 384, 387; 92 NW2d 511 (1958); *Cloverleaf Car Co v Phillips Petroleum Co*, 213 Mich App 186, 195; 540 NW2d 297 (1995). " '[I]t is enough that an act is done with knowledge that it will to a substantial certainty result in the entry of the foreign matter.' " *Adams*, 237 Mich App at 71, quoting 1 Restatement Torts, 2d, § 158, comment i, p 279. "Thus, a 'direct or immediate' invasion for purposes of trespass is one that is accomplished by any means that the offender knew or reasonably should have known would result in the physical invasion of the plaintiff's land." *Id*. Therefore, defendants must have had some actual or constructive knowledge that their conduct would result in flooding plaintiff's property.

Here, the evidence did not show that defendants had any *actual* knowledge that the boat well, cistern, and artesian spring casings were historically part of a functioning system that diverted and drained spring water from the parcels. Neither Spierling nor Lane spoke to plaintiff before the work was performed, and Lane testified directly to her lack of any "prior knowledge of how water was draining" from the properties other than her awareness of a sump pump that the sellers had installed to drain her basement. Lane further reported that, when she purchased her parcel, the realtor did not disclose any problems, with water drainage or otherwise, the sellers' disclosure statement revealed no issues, and the sellers informed her of no issues involving neighbors except for the encroachment of her garage onto an unrelated property. Lane testified that she did not speak to anyone, or have any other knowledge, about how water drained from her property to the lake. Spierling believed the boat well no longer served any purpose, and the evidence of the boat well's outward appearance would tend to support that belief. Therefore, the evidence does not support a finding that defendants *actually* knew their conduct would cause increased water to flow onto plaintiff's property.

Furthermore, for the reasons already discussed above, although defendants might have been expected to infer the presence of some kind of drainage system, the evidence does not show that they should have inferred that tampering with the structures would cause water to intrude upon plaintiff's property. Lane was not provided with any notice of water or drainage issues, and had no independent knowledge of how water drained from the property. She also testified that her deed did not indicate that wetlands existed on her property; that she was not aware of the artesian wells on her property; and that she did not observe on her property any evidence of standing water, depressions of wet ground, wetlands, or water coming up. Not even plaintiff entirely understood how the drainage system worked.

In short, there was no evidence from which it could be reasonably inferred that defendants knew or reasonably should have known that, by burying or filling the structures at issue, they were disrupting a working system that would affect the drainage or diversion of spring water so as to cause its intrusion onto plaintiff's parcel. Instead, the evidence indicated that Lane merely desired to fill in the obviously neglected boat well because it presented a dangerous condition, not knowing that doing so would somehow affect an existing drainage system. The evidence thus indicated that any part that defendants played in causing the alleged water intrusion was the result of accident. An action for trespass is not proper "[i]f the intrusion was due to an accident caused by negligence or an abnormally dangerous condition." *Cloverleaf*, 213 Mich App at 195. Because there is no

evidence that defendants knew, or had any reason to know, that the work on her property would result in water being directed onto plaintiff's property, they cannot be liable for trespass.[11]

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Amy Ronayne Krause
/s/ Mark T. Boonstra

---

[11] We therefore decline to consider plaintiff's alternative argument regarding the natural flow of water before plaintiff's father installed the drainage system, an argument that the trial court also did not explicitly decide.